**W.E. GREEN, plaintiff,**

**v.**

**Leroy BACA, defendant.**

**No. CV02–04744 MMM(MANx).**

United States District Court, C.D. California.

Jan. 24, 2005.

Stephen Yagman, Marion R. Yagman, Yagman & Yagman & Reichmann, Venice Beach, CA, for Plaintiffs.

Cindy S. Lee, David D. Lawrence, Jeremy B. Warren, Paul B. Beach, Franscell, Strickland, Roberts & Lawrence, Glendale, CA, for Defendants.

**Order on Motions in Limine**

MORROW, District Judge.

Plaintiff W.E. Green brings this action under 42 U.S.C. § 1983 and *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), against defendant Sheriff Leroy Baca,[1] in his official capacity. Anticipating the evidence that will be offered at trial, defendant has filed twelve motions *in limine.* These seek (1) to bifurcate the trial into two phases; (2) exclude evidence of other alleged "over-detentions" at the Los Angeles County Jail; (3) exclude the introduction into evidence of the Merrick Bobb reports;[2] (4) exclude evidence of media accounts regarding alleged "over-detentions" by the Los Angeles County Sheriff's Department; (5) exclude evidence regarding offers of compromise in this case and other cases involving the Los Angeles County Sheriff's Department; (6) exclude evidence of purported discovery violations by defendant in this case; (7) exclude evidence of the employment history of any Los Angeles County Sheriff's Department personnel who may testify at trial, including any prior or subsequent complaints of misconduct by these individuals; (8) exclude evidence of purported over-detentions of non-parolees;[3] (9) preclude testimony by Sheriff Leroy Baca; (10) preclude testimony by Merrick Bobb and the Custodian of Records of the Merrick Bobb Reports; (11) preclude testimony by Los An-

---

1. Other defendants were originally named in the complaint but have since been dismissed.

2. Motions *in Limine* Nos. 1–3 were originally filed November 18, 2003.

3. Motions in Limine Nos. 4–8 were originally filed September 7, 2004.

geles Times reporters Evelyn Larubia and Nicholas Riccardi, Los Angeles County Supervisor Gloria Molina, and Leroy Baca in connection with references to media accounts of alleged over-detentions; and (12) preclude plaintiff from calling witnesses for the sole purpose of referring to purported discovery violations in this case. Plaintiff moves *in limine* to exclude evidence of his prior criminal convictions, arrests and parole violations; and to exclude defense Exhibits 100, 102, 103 and 104. The court addresses each motion in turn.

## A. Defendant's Motion *in Limine* No. 1 to Bifurcate Trial

■ Defendant first moves to bifurcate the trial into two phases. Defendant proposes that the jury first address whether plaintiff was deprived of a federally protected right under section 1983. He then proposes that a second phase address whether defendant has an unconstitutional policy under *Monell.* The second phase would also deal with damages issues. Defendant contends that permitting the jury to hear evidence regarding defendant's policies and customs would unduly prejudice its determination as to whether plaintiff's constitutional rights were violated.

■ Rule 42(b) of the Federal Rules of Civil Procedure provides for separate trials of claims or issues if bifurcation will "further[ ] ... convenience or ... avoid prejudice, or when separate trials will be conducive to expedition and economy." Fed.R.Civ. Proc. 42(b). Whether to bifurcate is a decision reserved to the trial court's "sound discretion." See, e.g., *Cravens v. County of Wood, Ohio,* 856 F.2d 753, 755 (6th Cir.1988). The court should consider "potential prejudice to the parties, potential confusion to the jury, and the relative convenience and economy which would result." *Id.* (quotation omitted). "A decision ordering bifurcation is dependent on the facts and circumstances of each case." *Saxion v. Titan-C-Manufacturing,* 86 F.3d 553, 556 (6th Cir.1996).

Here, it is essentially undisputed that plaintiff was entitled to release some time in the late morning or early afternoon of July 6, 2001. Plaintiff was not released, however, until the early morning hours of July 14, 2001. Plaintiff has sued defendant under 42 U.S.C. § 1983, alleging that his policies and customs deprived plaintiff of his Fourteenth Amendment right to be released from confinement within a reasonable time after the reason for his confinement had ended. See *Brass v. County of Los Angeles,* 328 F.3d 1192, 1200 (9th Cir.2003) (noting that there is a "due process right to be released within a reasonable time after the reason for ... detention ended," citing *Baker v. McCollan,* 443 U.S. 137, 144–46, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)). Defendant seeks to bifurcate the trial so that the jury can first address whether plaintiff's constitutional rights were violated. He argues that bifurcation would be efficient because if the jury determines that plaintiff's rights were not violated, there would be no need for it to consider whether defendant had an unconstitutional policy and whether that policy caused the deprivation.

The court, of course, agrees that plaintiff cannot recover unless he shows that his constitutional rights were violated. See *Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point"); *Oklahoma City v. Tuttle,* 471 U.S. 808, 829, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (Brennan, J., concurring) ("To impose liability under section 1983, plaintiff 'must prove that (1) a person (2) acting under color of state law (3) subjected the plaintiff or caused the plaintiff to be subjected (4) *to the deprivation of a right secured by the Constitution or laws of the United States'* " (emphasis added)). At no time in this litigation, however, has defendant argued that plaintiff's rights under the Fourteenth Amendment were not violated when he was forced to remain in jail for seven and a half days after the reason for his confinement ended.[4] Rather, throughout the

---

4. At the September 27, 2004 hearing on these motions, defense counsel argued that defendant's

failure to assert that it was reasonable as a matter of law to delay plaintiff's release for seven

litigation, defendant's principal defense has been that his office did not cause the violation of plaintiff's rights.[5] Specifically, defendant has argued that the California Bureau of Prisons did not advise him that plaintiff was entitled to release until July 13, 2001, approximately 12.5 hours prior to his release.[6]

Plaintiff, by contrast, maintains that defendant's allegedly unconstitutional policies and customs were "the moving force" behind the violation of his federal rights.[7] *Oviatt v. Pearce,* 954 F.2d 1470, 1474 (9th Cir.1992) ("To impose liability on a local governmental entity for failing to act to preserve constitutional rights, a section 1983 plaintiff must establish: (1) that he possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy 'amounts to deliberate indiffer-

ence' to the plaintiff's constitutional right; and (4) that the policy is the 'moving force behind the constitutional violation,'" quoting *City of Canton v. Harris,* 489 U.S. 378, 389–91, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). He asserts that, even if defendant did not learn of his entitlement to release until July 13, 2001, this was a result of defendant's policies and customs, as evidenced by defendant's failure to investigate plaintiff's grievance. Thus, the principal issue at trial will be whether defendant's policies and customs were the moving force behind a deprivation of plaintiff's constitutional rights.

Defendant is not foreclosed, of course, from arguing that plaintiff was released, as an absolute matter, within a reasonable time after the reason for his confinement ended. This has not, however, been the thrust of his

---

and a half days did not constitute an admission that plaintiff's constitutional rights had been violated. (Reporters Transcript ("RT"), September 27, 2004, at 4:10–21). Defense counsel conceded, however, that the primary issue in this case is whether defendant's acts or omissions caused the delay. (*Id.* at 4:22–25).

5. See, e.g., Defendant's Memorandum of Contentions of Fact and Law ("Def.'s Trial Mem."), 4:19–23 ("Defendant *did not cause* a violation of plaintiff's constitutional rights because he was released within a reasonable time as a matter of law after the inmate reception center of the Los Angeles County Jail was notified that he was authorized to be released" (emphasis added)); February 20, 2004, Order on Defendant's Motion for Summary Judgment, Docket Entry No. 94 ("Sum.Judg.Ord."), 11:7–11 ("Defendant does not argue that this seven and a half day delay was reasonable as a matter of law. Rather, he asserts that the LASD did not receive notice that plaintiff was entitled to release until 12:44 p.m. on July 13, 2001. As plaintiff has sued the LASD, and not the Department of Corrections or the Board of Prison Terms, defendant maintains that the reasonableness of the delay must be measured from the time *the LASD* learned that plaintiff was entitled to release" (emphasis added, footnote omitted)).

6. Even were the jury to find that plaintiff was deprived of his liberty for only 12.5 hours after defendant received notice that plaintiff had a right to be released, the jury would still have to examine defendant's policies and customs to determine whether plaintiff was deprived of his federal constitutional rights. See *Gramenos v. Jewel Companies, Inc.,* 797 F.2d 432, 436–37 (7th Cir.1986) ("Gramenos ... seeks compensation for what he says is excessive detention.... The

police respond to it only by pointing out that they need to do a lot of things after an arrest—take fingerprints and mug shots, check for outstanding warrants, fill out countless forms. One difficulty is that none of the evidence in this case quantifies the amount of time it would take reasonably diligent officers to complete these tasks.... It is premature to say how long is too long.... On remand the police should explain what must be done after an arrest for shoplifting and why reasonably diligent officers need more than four hours to do it" (emphasis added)); see also Sum. Judg. Ord., 22:20–23:1 ("the court must, as the Ninth Circuit instructed in *Brass,* look to the 'circumstances of the case.' Here, beyond defendant's general allegations that the LASD needs time to complete certain administrative steps, and, more importantly, to check for wants and holds, defendant offers nothing justifying why it took twelve and a half hours to release plaintiff. Defendant does not attempt to explain why the allegedly necessary administrative steps took twelve and a half hours to complete. Thus, the court can neither find that twelve and a half hours was reasonable or that it was unreasonable. Certainly, it cannot determine reasonableness as a matter of law when defendant has offered only a general assertion that certain steps must be completed prior to release, and provided no explanation as to why those steps are necessary or why they take a particular period of time to complete").

7. See, e.g., Plaintiff's Memorandum of Contentions of Fact and Law ("Pl.'s Trial Mem."), 2:3–6 ("This over– or unlawful detention occurred pursuant to defendant's custom and policy and because of defendant's deliberate indifference to the rights of plaintiff and similarly-situated persons").

defense during the course of the litigation, and defendant have given no indication that his position at trial will be different. Therefore, to bifurcate the trial into phases that considered first whether there was a deprivation of rights, and second whether defendant's policies caused the violation, would be unduly confusing to the jury, and would not promote concerns of judicial efficiency.

It appears, in fact, that what defendant truly seeks to have determined in the first phase of the trial is whether defendant *caused* plaintiff's over-detention. Plaintiff cannot establish causation, however, without proving the existence of an unconstitutional policy or custom. See *White v. City of Markham*, 310 F.3d 989, 998 (7th Cir.2002) ("Therefore, to maintain a § 1983 claim against the City of Markham, White must establish both 'the requisite culpability (a "policy or custom" attributable to municipal policy-makers), and the requisite causation (the policy or custom was the "moving force" behind the constitutional deprivation)),'" quoting *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir.2002); *Birdsall v. City of Hartford*, 249 F.Supp.2d 163, 173 (D.Conn. 2003) ("Absent a showing of a chain of causation between an official policy or custom and the plaintiffs' injury, *Monell* prohibits a finding of liability against a municipality"). Bifurcation of causation from the existence of an unlawful policy is not a feasible option as a result.

Defendant argues that the Ninth Circuit's decision in *Quintanilla v. Downey*, 84 F.3d 353 (9th Cir.1996) mandates a contrary conclusion. There, the plaintiff brought a section 1983 claim against City of Downey, its police chief, and three individual officers alleging that the officers violated his constitutional rights through their use of a police dog to detain him. The district court bifurcated the trial of the liability of the individual police officers from trial of the liability of the chief and city. This enabled the court to separate the questions regarding the constitutionality of the three officers' actions from the questions regarding the chief's and city's liability under *Monell. Id.* at 356. In an attempt to avoid the court's bifurcation ruling, plaintiff sought to dismiss the three offi-

cers from the suit and offer evidence of the chief's and city's policies during the first phase. The district court rejected this effort. *Id.* at 355. After the jury returned a special verdict finding that the individual officers had not used excessive force in violation of the plaintiff's Fourth Amendment rights, the court entered judgment for the chief and the city. *Id.* at 355. On appeal, the Ninth Circuit held that because an individual may recover under section 1983 only when that individual's federal rights have been violated, the plaintiff could not circumvent the bifurcation and evidentiary rulings by voluntarily dismissing the three individual officers and proceeding to demonstrate the existence of a policy using evidence of attacks more severe than his own. *Id.* at 356.

*Quintanilla* differs from this case, in that one of the core issues there in dispute was whether the officers' use of the police dog amounted to excessive force that violated the plaintiff's constitutional rights. Plaintiff sought to hold the city and the chief liable on the basis that their policies resulted in the constitutional violation caused by the officers. Here, by contrast, plaintiff alleges that his constitutional rights were violated by the County's detention policies. The case in this respect is quite similar *Fairley v. Luman*, 281 F.3d 913 (9th Cir.2002), in which plaintiff alleged, *inter alia*, that he was held for twelve days on an outstanding warrant for his twin brother due to a policy, custom or practice of the police department. The Ninth Circuit rejected defendants' contention that the municipality could not be held liable as a matter of law because no individual officers had been found to have committed the constitutional violation alleged. It stated that *Quintanilla* had "no bearing on [plaintiff's] ... Fourteenth Amendment claim[ ] against the City for ... deprivation of liberty without due process," because it was "not suffered as a result of actions of the individual officers, but as a result of the collective inaction of the Long Beach Police Department." *Id.* at 916–17; see also *Gibson v. County of Washoe, Nevada*, 290 F.3d 1175, 1186, n. 7 (9th Cir.2002) ("The municipal defendants ... assert that if we conclude ... that the individual deputy defendants are not liable for violating Gibson's constitutional

rights, then they are correspondingly absolved of liability. Although there are certainly circumstances in which this proposition is correct, ... it has been rejected as an inflexible requirement by both this court and the Supreme Court.... [I]n *Fairley v. Luman*, 281 F.3d 913 (9th Cir.2002), we explicitly rejected a municipality's argument that it could not be held liable as a matter of law because the jury had determined that the individual officers had inflicted no constitutional injury.... 'If a plaintiff established he suffered constitutional injury by the City, the fact that individual officers are exonerated is immaterial to liability under § 1983,'" quoting *Fairley, supra*, 281 F.3d at 916). Because plaintiff alleges that his constitutional rights were violated by County policies or inaction, rather than individual officers, bifurcation such as occurred in *Quintanilla* is not appropriate.[8]

As plaintiff notes, cases in which courts have bifurcated whether there has been an underlying constitutional violation from *Monell* liability for trial have all involved claims against individual officers as well as against the municipality. Bifurcation is appropriate in such a situation to protect the individual officer defendants from the prejudice that might result if a jury heard evidence regarding the municipal defendant's allegedly unconstitutional policies. See, e.g., *Quintanilla, supra*, 84 F.3d at 356 ("The district court, under Fed.R.Civ.P. 42(b), in the interest not only of convenience and judicial economy but also the avoidance of potential prejudice and confusion, bifurcated the trial of the individual police officers from the Chief and city"); *Larez v. Los Angeles*, 946 F.2d 630, 635 (9th Cir.1991) ("Trial was bifurcated between the case against the six officers and the case against ... the City"). Here, where there are no claims against any officers in their individual capacities,[9] such concerns are not present. See *Fairley, supra*, 281 F.3d at 916–17 (holding that a city could be held

liable on plaintiff's claim that he was wrongfully deprived of his liberty when he was held on a warrant for his twin brother for twelve days, despite the fact that individual officers were exonerated on allegations that they used excessive force and arrested him without probable cause because the "alleged constitutional deprivation [caused by his detention on the warrant was] not suffered as a result of actions of the individual officers, but as a result of the collective inaction of the Long Beach Police Department").

There is little doubt that evidence presented by plaintiff regarding defendant's alleged policy and custom of being deliberately indifferent to the rights of persons entitled to release will be prejudicial to defendant. There is no indication that it will be *unfairly* prejudicial, however. Rather, it is clearly necessary for plaintiff to introduce such evidence to prove his only claim against defendant—i.e., that defendant's policies and customs caused the deprivation of his federal rights. See *City of Canton, supra*, 489 U.S. at 398, 109 S.Ct. 1197 (O'Connor, J., concurring in part) ("[R]espondent thus had every incentive to adduce proof at trial of *a pattern of violations* to support her claim that the city had an unwritten custom of denying medical care to emotionally ill detainees" (emphasis added)); *Quintanilla, supra*, 84 F.3d at 356 ("... the trial evidence submitted for the purpose of demonstrating the existence of an unconstitutional policy ... included summaries of medical treatment rendered to persons bitten by police dogs, and prepared for an unrelated case; photographs of injuries inflicted by police dogs in unrelated incidents; a police dog training videotape; and a videotape of an arrestee being attacked by a police dog"); *Oviatt, supra*, 954 F.2d at 1478 ("Specifically, Sheriff Pearce knew of at least 19 incidents between 1981 and 1989 in which individuals sat in jail for periods of undetermined length after they missed arraignment. Given the lack of pro-

---

8. Indeed, as noted earlier, the primary dispute in this case is not whether plaintiff's rights were violated—i.e. whether the seven and a half day delay was reasonable—but whether the delay was caused by defendant's policies and customs. (*Id.* at 4:22–25.)

9. Although plaintiff purported to state claims against defendant Baca in his individual capacity, the court granted summary judgment in Baca's favor on these claims. (Sum. Judg. Ord., 24:16–17 ("... the court grants defendant's motion for partial summary judgment on plaintiff's claims against him in his individual capacity")).

cedures to alleviate this problem, it was virtually certain that some inmates would, as a result, be erroneously deprived of their liberty").

In sum, the court concludes that bifurcation would likely confuse the jury, would be inconvenient, and would not be economical. Moreover, the court finds that there is little, if any, potential for *undue* prejudice to defendant. Accordingly, defendant's motion to bifurcate the trial is denied.[10]

### B. Defendant's Motion *in Limine* No. 2 to Exclude Other Acts Evidence

■ Defendant next moves to exclude evidence of other alleged "over-detentions" at the Los Angeles County Jail. Defendant asserts that such evidence is unnecessary because "[t]he outcome of this case depends upon the jury's evaluation of the circumstances surrounding *Plaintiff's* incarceration and release."[11] The court agrees that the jury must decide this case by considering the circumstances surrounding plaintiff's incarceration and release. The circumstance most disputed in this case, however, is whether plaintiff's continued incarceration following his July 6, 2001, parole revocation hearing was the result of unconstitutional policies and customs of the defendant. To prove that defendant had an unconstitutional policy and custom that was the "moving force" behind plaintiff's continued detention, plaintiff must introduce evidence regarding other acts committed by defendant vis-á-vis persons in a position similar to plaintiff. See *City of Canton, supra,* 489 U.S. at 398, 109 S.Ct. 1197 (O'Connor, J., concurring in part); *Quintanilla, supra,* 84 F.3d at 356; *Oviatt, supra,* 954 F.2d at 1478.[12] As a consequence, so-called "other acts" evidence is relevant to the central liability issue—whether defendant had an unconstitutional policy and custom that led to plaintiff's over-detention.

■ Defendant next argues that evidence of "other acts" should be excluded pursuant to Rule 403. The court excludes evidence under Rule 403 if its probative value is substantially outweighed by the danger of unfair prejudice, or if it would lead to jury confusion. FED.R.EVID. 403. Evidence is unfairly prejudicial if it tends to suggest decision on an improper basis, particularly an emotional one. See *United States v. Allen,* 341 F.3d 870, 886 (9th Cir.2003) (" 'Unfair prejudice' . . . means 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one' "); *Steger v. General Electric Co.,* 318 F.3d 1066, 1079 (11th Cir.2003) ("Evidence is . . . excludable 'if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.' " . . . " 'Unfair prejudice' . . . means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one," quoting FED. R.EVID. 403, Advisory Committee Notes); *Stump v. Gates,* 211 F.3d 527, 534 (10th Cir.2000) (same).

While the evidence of other acts offered by plaintiff may be prejudicial to defendant insofar as it tends to suggest that he has maintained an unconstitutional policy, it will not be *unfairly* prejudicial. The court therefore declines to enter an order excluding all evidence of other over-detentions. Such an order would be particularly inappropriate in light of the fact that it appears it will be the only (or certainly the key) evidence offered to prove an unconstitutional policy, custom, or practice. See, e.g., *United States v. Jackson,* 339 F.3d 349, 356 (5th Cir.2003) ("The prior conviction in this case had very little probative value when considering the other evidence going to intent . . ."); *U.S. v. Gabriel,* 125 F.3d 89, 96 (2d Cir.1997) ("In light of defendants' decision to challenge materiality aggressively, we conclude that the district court did not abuse its discretion when it

---

10. Defendant has articulated no separate reason why the court should bifurcate trial into liability and damages phases.

11. Defendant's Motion *in Limine* No. 2, 4:13–14 (emphasis original).

12. Defendant in effect concedes the relevance of the evidence, since he does not appear to object to its introduction in a bifurcated trial. See Defendant's Motion *in Limine* No. 2, note 1 (stating that "the thrust of the instant motion *in limine* is that Plaintiff's 'other acts' evidence should be excluded at least from Phase I of the trial").

gave the government leeway to introduce air safety evidence...").

For the reasons stated, defendant's motion to exclude "other acts" evidence of alleged over-detentions by defendant is denied.

### C. Defendant's Motion *in Limine* No. 3 to Preclude Evidence of Reports by Special Counsel Merrick Bobb

Defendant next moves to exclude introduction of the Merrick Bobb reports into evidence. He argues that introduction of the reports is barred by Rule 407 of the Federal Rules of Evidence, and that the reports are inadmissible hearsay. The court considers each argument in turn.[13]

#### 1. Rule 407

Federal Rule of Evidence 407 provides:
"When, after an injury or harm allegedly caused by an event, measures are taken that, if taken previously, would have made the injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove negligence, culpable conduct, a defect in a product, a defect in a product's design, or a need for a warning or instruction. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment." FED. R.EVID. 407.

■ The reports plaintiff intends to introduce appear to have been prepared prior to the incident that is the subject of this lawsuit. Rule 407, by its terms, requires that the measures take place "subsequent" to the incident before they may be excluded.[14] The Ninth Circuit dealt with a similar set of facts in *In re Aircrash in Bali*, 871 F.2d 812 (9th Cir.), cert. denied, 493 U.S. 917, 110 S.Ct.

277, 107 L.Ed.2d 258 (1989). There, the district court permitted plaintiffs, who represented the estates of persons killed in an airplane crash in Bali, Indonesia, to introduce evidence at trial of a report prepared by defendant Pan Am "on Pan Am's safety record and problems, which was apparently completed just before the Bali crash." *Id.* at 816. Pan Am argued that the evidence should have been excluded under Rule 407. The circuit court rejected the argument, stating: "Since the Thomas Report, a comprehensive report many months in the making, was dated only one day after the Bali crash, it is patently clear it was not a response to the crash. We find no basis for treating the Thomas Report as a subsequent remedial measure." *Id.*

There is no reasonable basis for distinguishing the Merrick Bobb reports, which were prepared prior to the incident in question,[15] from the reports at issue in the *Aircrash in Bali* case. See also *Bogosian v. Mercedes–Benz of N. America*, 104 F.3d 472, 481 (1st Cir.1997) ("Federal Rule of Evidence 407 ... does not apply where, as here, the modification took place before the accident that precipitated the suit"); *Cates v. Sears, Roebuck & Co.*, 928 F.2d 679, 686 (5th Cir. 1991) ("In the instant case, the issue of the warning placard and the revised manual goes to warnings which were changed by the involved manufacturer after the sale but prior to the accident"); *Richmond v. Madison Management Group, Inc.*, 918 F.2d 438, 460 (4th Cir.1990) ("Resolution of the question is dispositive because, if the event was the sale of the pipe, the remedial measure was 'subsequent' and therefore evidence of it was inadmissible, while if the event was the bursting of the pipe, the remedial measure was not 'subsequent' and therefore evidence of it was admissible"). The court, accordingly, con-

---

**13.** Defendant notes that the Bobb reports state they should not be used in litigation, but cites no principle of law that would permit the exclusion of a publicly available document simply on the basis that it includes such a statement.

**14.** For purposes of this discussion, the court assumes, without deciding, that the reports constitute "measures" taken to reduce the likelihood of injury or harm from over-detentions.

**15.** To the extent that plaintiff seeks to introduce reports prepared subsequent to the incident at issue in this case, defendant may interpose specific objections to the introduction of those reports at trial. The court will consider the objections when, and if, made.

cludes that Rule 407 does not provide a basis for the exclusion of the Bobb reports.

### 2. Hearsay

■ Defendant next objects that the Bobb reports are inadmissible hearsay. It is clear from defendant's brief that Bobb acts as defendant's agent in preparing the reports.[16] The reports are thus party admissions, and are not hearsay. See FED.R.EVID. 801(d)(2)(D) ("a statement by [the party's] agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship" is not hearsay); *In re Aircrash in Bali, supra,* 871 F.2d at 816 ("Pan Am argues that the district court erred in admitting the Thomas report pursuant to Rule 801(d)(2)(D). ... Since all but one of the eight authors of the report were experienced Pan Am crew members, we hold that the Thomas report was admissible as an admission of Pan Am employees concerning matters within the scope of their employment").

■ Even if the Bobb reports are not considered party admissions, moreover, the court would conclude that they were admissible as public records under Rule 803(8)(C). See FED.R.EVID. 803(8)(C) ("The following are not excluded by the hearsay rule, even though the declarant is available as a witness: ... Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth ... in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness"); see also *Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 170, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988) ("As long as [an opinion or] conclusion

is based on a factual investigation and satisfies the Rule's trustworthiness requirement, it should be admissible along with other portions of the report").[17]

In a similar case in this district, Judge Consuelo Marshall held that the Bobb reports were admissible under Rule 803(8)(C). See *Gallagher v. City of West Covina,* No. CV 00–00377 CBM (RNBx), 2002 WL 826603, *1, n. 1 (C.D.Cal. April 29, 2002) ("Defendants object to Plaintiff's reliance on the Report arguing that the Report is double hearsay because it was written by Merrick Bobb and based on matters that were not within his personal knowledge. However, the Report falls within the hearsay exceptions for public records and reports ..."); see also *Montiel, supra,* 2 F.3d at 341 ("Montiel next argues the district court erred in excluding portions of *The Report of the Independent Commission on the Los Angeles Police Department,* commonly referred to as the Christopher Commission Report after Warren Christopher, the chairperson of the Commission.... [T]he district court's cursory denial of Montiel's Rule 803(8)(C) motion concerns us. The district court should have presumed the Christopher Commission Report was trustworthy..."); *In re Aircrash in Bali, supra,* 871 F.2d at 816 ("The Hudson report [prepared by the Federal Aviation Administration] was properly admitted pursuant to Fed.R.Evid. 803(8)(C), which creates a hearsay exception for public documents. Contrary to Pan Am's assertions, the Hudson report was not inadmissible under Rule 803(8)(C) simply because it includes evaluative or normative findings").

For the reasons stated, the court finds that the Bobb reports are not hearsay, or that they fall within an exception to the hearsay rule.

**16.** See Defendant's Motion *in Limine* No. 3, 4:1–5 ("... the County of Los Angeles retained him as Special Counsel to review the Sheriff's Department and its operations and activities ..."). As Baca is being sued in his official capacity, he is essentially a surrogate for the County in this action. See *Butler v. Elle,* 281 F.3d 1014, 1026, n. 9 (9th Cir.2002) ("the real party in interest in an official-capacity suit is the governmental entity and not the named official").

**17.** Defendant did not reply to plaintiff's argument that the Bobb reports were admissible under Rule 803(8)(C). Thus, he has made no argument that the Bobb reports are untrustworthy. See *Montiel v. City of Los Angeles,* 2 F.3d 335, 341 (9th Cir.1993) ("Public records falling under Rule 803(8)(C) are presumed trustworthy, placing 'the burden of establishing untrustworthiness on the opponent of the evidence' ").

### 3. Rule 403

■ Defendant next argues in conclusory fashion the Bobb reports should be excluded under Rule 403. Defendant, however, fails to explain why the probative value of the reports is substantially outweighed by their tendency to cause unfair prejudice. As discussed *infra*, portions of the Bobb reports that relate to settlements and over-detentions occurring before the 1998–1999 fiscal year are inadmissible. As a general matter, however, because portions of the Bobb reports are relevant to plaintiff's argument that defendant has a custom or policy that contributes to the over-detention of prisoners at the Los Angeles County Jail, and because defendant has articulated no reason why the reports are unfairly prejudicial, the court concludes that their probative value is not substantially outweighed by the danger of undue prejudice.

### 4. Conclusion Respecting the Bobb Reports

As the court has found that the Bobb reports are neither inadmissible hearsay nor inadmissible under Rule 407, and as there is no basis for exclusion under Rule 403, defendant's motion *in limine* to exclude the reports is denied.

### D. Defendant's Motion *in Limine* No. 4 to Exclude Evidence of Media Accounts Regarding "Over-detentions" by the Los Angeles County Sheriff's Department

Defendant also moves to exclude evidence of newspaper, television and other media accounts of alleged "over-detentions" by the Los Angeles County Sheriff's Department, as well as media accounts regarding this litigation. Citing Rule 802 of the Federal Rules of Evidence, defendant argues that the content of such accounts is inadmissible hearsay. *Larez, supra,* 946 F.2d at 642; *Pallotta v. United States,* 404 F.2d 1035 (1st Cir.1968). Plaintiff counters that *Larez* supports his argument that two *Los Angeles Times* newspaper articles are admissible under the residual hearsay exception set forth in Rule 807 of the Federal Rules of Evidence.

"Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R.Evid. 801(C). Hearsay is not admissible, except as provided by the Federal Rules of Evidence or other rules proscribed by the Supreme Court pursuant to statutory authority or by Act of Congress. Fed.R.Evid. 802. Rules 803 and 804 of the Federal Rules of Evidence list various exceptions to the hearsay rule. Rule 807 creates a residual exception that allows for the admission of hearsay if the statement is offered as evidence of a material fact, the statement is more probative than any other evidence that the proponent can procure, and the purpose of the rules and the interests of justice will be served by the admission of the statement into evidence.[18] Fed.R.Evid. 807.

■ Generally, newspaper articles and television programs are considered hearsay under Rule 801(c) when offered for the truth of the matter asserted. See *U.S. ex rel. Woods v. Empire Blue Cross and Blue Shield,* 2002 WL 1905899, *1, n. 1 (S.D.N.Y. April 19, 2002); *In re Columbia Securities Litigation,* 155 F.R.D. 466, 474 (S.D.N.Y.1994) (holding that press reports were hearsay because they were out-of-court statements offered to prove the truth of the matter asserted). Even when the actual statements quoted in a newspaper article constitute nonhearsay, or fall within a hear-

---

**18.** Rule 807 provides: "A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. A statement may not be admitted under this exception, however, unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant." Fed.R. Evid. 807.

say exception, their repetition in the newspaper creates a hearsay problem. See *Larez, supra*, 946 F.2d at 642 (9th Cir.1991) ("As the reporters never testified nor were subjected to cross-examination, their transcriptions of Gates's statements involve a serious hearsay problem"). Thus, statements in newspapers often constitute double hearsay. See *United States Football League v. Nat'l Football League*, 1986 WL 5803, *2 (S.D.N.Y. May 16, 1986) (holding that statements of belief by unknown declarants reiterated in a newspaper article constituted hearsay within hearsay).

▇ Plaintiff seeks to introduce two *Los Angeles Times* articles regarding over-detentions at the Los Angeles County Jail.[19] The first article, titled "County to Pay Inmates Millions," was written by *Times* reporters Evelyn Larrubia and Nicholas Riccardi.[20] The second article, titled "Lawyers, Red Tape Stalled End to Illegal Jail Detentions," was written by Riccardi.[21] To the extent plaintiff intends to offer the articles for the truth of the matter asserted, they clearly constitute hearsay. Moreover, to the extent the articles quote statements by other individuals, and those statements are offered for the truth of the matter asserted, they constitute double hearsay.[22] See *United States Football League, supra*, 1986 WL 5803 at *2.

The question thus becomes whether the articles are nonetheless admissible under the residual hearsay exception of Rule 807. In *Larez, supra*, the Ninth Circuit considered whether newspaper articles quoting statements by Los Angeles Police Chief Daryl

Gates were admissible under the residual hearsay exception of then Rule 803(24). *Larez* was a civil rights action against the City of Los Angeles, Gates and individual members of the Los Angeles police department. After the jury returned a $90,000 verdict against the individual officers during the first phase of the trial, reporters asked Gates for his reaction. Gates made several damning statements.[23] *Larez, supra*, 946 F.2d at 641. The trial court admitted the statements during the second phase of the trial, which addressed, *inter alia*, Gates' individual liability for compensatory and punitive damages. It found that Gates' out-of-court statements posed no hearsay problem, either because they were the admissions of a party opponent, or because they were not offered for the truth of the matter asserted, but rather to show Gates' state of mind. *Id.* at 642.

On appeal, the Ninth Circuit held that although the statements themselves were nonhearsay, their repetition in the newspaper created a hearsay problem. *Larez, supra*, 946 F.2d at 642. The court also concluded that the newspaper articles were not admissible under the residual hearsay exception of Rule 803(24). Although noting other decisions holding that newspaper articles generally do not have circumstantial guarantees of trustworthiness as required by Rule 803(24), the court concluded that under the "'extraordinary circumstances'" of the case, where three independent newspapers attributed the statements to Gates, and Gates himself did not dispute the fact that he had made the statements, the reports were trustworthy. The court also concluded that the

---

**19.** Plaintiff's Amended Opposition to Defendant's Motion *in Limine* ("Pl.Am.Opp"), at 3.

**20.** *Id.*, Exhibit 1.

**21.** *Id.*

**22.** The articles are not double hearsay to the extent they repeat statements made by Sheriff Leroy Baca, as such comments would be the admissions of a party opponent. See FED.R. EVID. 801(d)(2). Absent testimony by the reporters, however, the articles' repetition of Baca's statements would present a hearsay problem. See *Larez, supra*, 946 F.2d at 642 ("The statements' repetition in the newspapers, however, posed a more difficult [hearsay] problem which the district court failed to address").

**23.** Three newspapers attributed the following statements to Gates:

1. "How much is a broken nose worth?"
2. "$90,000? I don't think it's worth anything. He's probably lucky that's all he has."
3. "Given the circumstances in this case, I don't think it's worth anything. [Larez] is probably lucky that's all he had broken."
4. "They [the jurors] see the family there all cleaned up.... They don't know their background, that there is a gang member on parole. They get very sympathetic."
5. "I tell my officers to do something—and we do something and they give them $90,000."

statements satisfied Rule 803(24)'s requirements that they be offered as evidence of a material fact, and that the purpose of the evidentiary rules and the interests of justice support admissibility. *Id.* at 643–44. The court held, however, that the statements did not satisfy Rule 803(24)'s requirement that they be "more probative on the point for which [they were] offered than any other evidence which the proponent can procure through reasonable efforts." Interpreting the subsection as creating a "best evidence" requirement, the court concluded that admission of the statements "was erroneous because the newspaper quotations were not the best available evidence of what Gates said; testimony from the reporters themselves would have been better." *Id.* at 644.[24]

Plaintiff argues that because he plans to call Larrubia and Riccardi to testify,[25] he has cured the hearsay problem addressed by the Ninth Circuit in *Larez.* Plaintiff misinterprets *Larez.* The Ninth Circuit did not hold that the newspapers articles would have been admissible if the reporters themselves had been called to testify. Rather, the court held only that, because the reporters were available to testify, the articles were not the most probative evidence plaintiff could have procured through reasonable efforts. *Larez, supra,* 946 F.2d at 644 ("Thus, the error was the failure to take testimony from, and particularly to allow the cross-examination of, the reporters who repeated Gates's comments").[26]

Plaintiff represents that both Larrubia and Riccardo are able and willing to testify.[27] Additionally, plaintiff has procured through

discovery specific records of the defendant that detail the number of over-detentions at the Los Angeles County Jail. As a consequence, and as was the case in *Larez,* the articles are not the most probative evidence available of the facts plaintiff seeks to prove. Further, the articles plaintiff seeks to introduce lack the circumstantial guarantees of trustworthiness that are required for admission under Rule 807. Unlike the plaintiff in *Larez,* plaintiff here has not offered evidence from independent sources corroborating the information recited in the articles. Nor has there been any showing that defendant does not dispute the statements attributed to him in the articles. See *In re Columbia Securities Litigation,* 155 F.R.D. 466, 475 (S.D.N.Y. 1994) ("Newspaper and magazine articles, however, may nevertheless be introduced into evidence if they are bolstered by supporting evidence that confers some circumstantial guarantees of trustworthiness upon them"). Thus, there are no "extraordinary circumstances" in this case that demonstrate the trustworthiness of the newspaper articles, and warrant their admission.[28]

As the court has found that the two newspaper articles plaintiff wishes to introduce lack circumstantial guarantees of trustworthiness and are not the most probative evidence available, defendant's motion *in limine* to exclude the newspaper articles is granted.

**E. Defendant's Motion *in Limine* No. 5 to Exclude Evidence of Offers of Compromise Involving The Los Angeles County Sheriff's Department**

Defendant next requests that the court exclude evidence of offers of compromise in

---

24. The court also noted that admission of the reports might have been improper because defense counsel had insufficient time to prepare arguments in response. *Id.* at 644, n. 8.

25. Plaintiff has listed the reporters' names and addresses on his Supplement to Amended Witness List.

26. Stating that it could not predict what evidence would be offered, the court did not decide whether the statements could be admitted at retrial.

27. The court below concludes that the testimony of these witnesses should be excluded because plaintiff failed to disclose them as required by Rule 26. The fact that plaintiff may not be able to present the testimony of the reporters does not

mean that the articles are the most probative evidence available of the facts he seeks to prove. Otherwise, a party could secure the right to present less probative evidence under Rule 807 simply by failing to follow the Rules of Evidence or Rules of Civil Procedure.

28. As plaintiff does not indicate which specific statements in the articles he seeks to admit, the court cannot address whether the statements satisfy Rule 807's requirement that they be offered as evidence of a material fact, and that their admission will serve the general purposes of the Federal Rules of Evidence and the interests of justice.

this action as well as offers to compromise other over-detention cases involving the Los Angeles County Sheriff's Department. Defendant anticipates that plaintiff will attempt to introduce evidence of other settlements, including a $27 million settlement in a prior class action, and argues that such evidence is inadmissible under Rule 408 of the Federal Rules of Evidence. Plaintiff counters that evidence of the settlements is admissible because it will "be offered 'not to prove liability for, or invalidity of the claim or its amount … but rather to prove defendant's *Monell* policy of over-detaining inmates."

Rule 408 of the Federal Rules of Evidence states:

"Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution." FED.R. EVID. 408.

It is clear that any attempt by plaintiff to introduce evidence of settlement negotiations regarding his claim to prove liability would be prohibited by Rule 408. The same prohibition extends to evidence of completed settlements in other cases where the evidence is offered against the compromiser. See *Hudspeth v. Commissioner of Internal Revenue*

*Service,* 914 F.2d 1207, 1213 (9th Cir.1990) ("The Taxpayers contend that Rule 408 is inapplicable to the present case because they were not parties to the Pine Products settlement and the claims involved in the present case are not the same claims that were involved in the Pine Products case. The Taxpayers' contention that Rule 408 does not apply when third party compromises are involved is not tenable. Rule 408 does apply to situations where the party seeking to introduce evidence of a compromise was not involved in the original compromise"); [29] *Young v. Verson Allsteel Press Co.* 539 F.Supp. 193, 196 (E.D.Pa.1982) ("And Rule 408 of the Federal Rules of Evidence extends the exclusion to completed compromises when offered against the compromiser"); *Playboy Enterprises, Inc. v. Chuckleberry Pub.,* 486 F.Supp. 414, 423, n. 10 (S.D.N.Y. 1980) ("To consider the terms of that settlement in this action would be improper and unjustified. It is well-established that statements made for purposes of settlement negotiations are inadmissible, and Rule 408 of the Federal Rules of Evidence extends the exclusion to completed compromises"); see also FED.R.EVID. 408, Advisory Committee Note ("While the rule is ordinarily phrased in terms of offers of compromise, it is apparent that a similar attitude must be taken with respect to completed compromises when offered against a party thereto. This latter situation will not, of course, ordinarily occur except when a party to the present litigation has compromised with a third person").

■ Plaintiff argues, however, that evidence of past settlements of over-detention claims is admissible because he does not seek to offer the evidence to prove defendant's liability, but rather to prove defendant's *Monell* policy of over-detaining inmates. This argument does not withstand scrutiny. As noted earlier, to prove liability, plaintiff must

**29.** The *Hudspeth* court relied on an earlier Ninth Circuit decision, *United States v. Contra Costa County Water District,* 678 F.2d 90, 92 (9th Cir. 1982). The court noted that "[t]he Taxpayers [had] attempt[ed] to distinguish their situation from the *Contra Costa* case by claiming that in the *Contra Costa* case the compromise involved the same factual situation." *Id.* at 1214, n. 8. It rejected this distinction, however, noting that

"the Taxpayers' case also involve[d] the same factual situation" in that "[i]n both [their case and the Pine Products case,] the issue was the valuation of timber taken from the same forest and timber that was of similar quality." *Id.* Here, the settlement evidence plaintiff seeks to introduce involves over-detention in the same jail facility, allegedly as a result of the same custom, practice or policy.

prove that defendant had an unconstitutional policy or custom that was the "moving force" behind plaintiff's continued detention. *City of Canton, supra,* 489 U.S. at 398, 109 S.Ct. 1197 (O'Connor, J., concurring in part). Thus, the existence of a policy or custom of over-detaining inmates is a central element of plaintiff's claim. Without proving this fact, plaintiff cannot establish liability. Rule 408 clearly prohibits the introduction of evidence of settlement negotiations to prove liability.

Plaintiff next argues that Rule 408 only precludes evidence of settlements in this case, not evidence of settlements in other actions. This proposition is against the great weight of authority, and has been rejected by the Ninth Circuit. See *Hudspeth, supra,* 914 F.2d at 1213; *U.S. v. Contra Costa County Water District, supra,* 678 F.2d at 92 (excluding evidence of plaintiff's settlement with a third party because of the public policy favoring compromise); *Playboy Enterprises, Inc. v. Chuckleberry Pub., Inc.,* 687 F.2d 563, 569 (2d Cir.1982) (holding that plaintiff's settlement negotiations in a prior trademark action were not admissible as evidence in a subsequent action); *Scaramuzzo v. Glenmore Distilleries, Co.,* 501 F.Supp. 727, 733 (N.D.Ill.1980) ("It would be logically inconsistent to uphold the vitality of Rule 408, while at the same time holding that a settlement

offer could be used against the offeror in related cases. An offer of settlement can be of no legal relevance as to the offeror's liability, irrespective of whether the offer was made in the instant case or in a related case").

▮ Plaintiff also seeks to introduce evidence of the amount of settlements as evidence of defendant's deliberate indifference to its practice of over-detaining inmates. Plaintiff contends that the settlements are over-reaching, oppressive, and coercive, that they involved small sums of money, and that they manifest defendant's failure to implement proper release policies.[30] Just as he must prove the existence of a custom or practice to prevail in this case, plaintiff must prove deliberate indifference. See *Berry v. Baca,* 379 F.3d 764, 768 (9th Cir.2004) (stating, in an over-detention case, that plaintiffs' challenge to defendant's release policies "in toto" was a deliberate indifference claim). Thus, to the extent that plaintiff seeks to introduce the amount of the settlements, or the manner in which they were negotiated, to prove defendant's deliberate indifference, he is offering the evidence to prove liability.[31]

▮ Lastly, plaintiff argues that the settlements are admissible to prove that defendant had notice that over-detentions were occurring at the jail. Although Rule 408 prohibits the admission of settlements to

---

30. Plaintiff's Offer of Proof at 4.

31. It appears that plaintiff contends the circumstances surrounding defendant's entry into the settlements were so oppressive that they cannot be considered true compromises. See *Cassino v. Reichhold Chemicals, Inc.,* 817 F.2d 1338, 1342–43 (9th Cir.1987) (holding that Rule 408 did not exclude evidence of an $18,000 severance offer made to an employee at the time of his termination and that was conditioned upon the release of all discrimination claims); *Southeast Capital Inv. Corp. v. Albemarle Hotel, Inc.,* 550 So.2d 49, 52 (Fla.App.1989) (holding that a Florida evidence rule similar to Rule 408 did not exclude a statement by defendant's president that he would look for a way to break defendant's contract with plaintiff or put a "shell corporation" into bankruptcy to avoid paying the contract price if plaintiff did not agree to alter the terms of the contract); see also 5 Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure, § 5306 (2d ed. 2002 & 2004 Supp.) (noting that the Tenth Circuit's decision in *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.,* 561 F.2d 1365 (10th Cir.1977), "may well have been moti-

vated by the desire to police settlement tactics by denying the protection of Rule 408 to a litigant who threatened to strongarm an opponent"); but see *Mundy v. Household Finance Corp.,* 885 F.2d 542, 546–47 (9th Cir.1989) (holding that the trial court did not abuse its discretion in holding that Rule 408 excluded evidence that an employer sought a release of discrimination claims in exchange for $25,000 where the offer was not made contemporaneously with the employee's termination, but rather three weeks after discharge, and at a time when the former employee had already received three months severance pay and other benefits). Plaintiff has not adduced sufficient facts regarding any of the settlements to support his claim that they were not true offers of compromise. If plaintiff is in possession of specific facts regarding particular settlements, he may make an offer of proof, outside the presence of the jury, so that the court can determine whether the circumstances surrounding the alleged settlements support such an inference.

prove liability for or the invalidity of a claim or its amount, it "does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution." FED. R.EVID. 408. "The use of the phrase 'such as' implies that the ensuing list is not exhaustive, but is only illustrative." *United States v. Technic Servs., Inc.,* 314 F.3d 1031, 1045 (9th Cir.2002). In *Spell v. McDaniel,* 824 F.2d 1380, 1400 (4th Cir.1987), the Fourth Circuit held that evidence of a city's settlement of an earlier police brutality action was properly admitted to show that the city was sufficiently aware of aggressive conduct by police officers; see also *United States v. Austin,* 54 F.3d 394, 400 (7th Cir.1995) (holding that evidence of a past settlement was admissible to show that defendant had notice that conduct was wrongful).

The court agrees that showing defendant was aware of the number of alleged over-detentions is essential to establish liability under *Monell,* and that evidence of the number of settlements into which he entered may be admissible to prove knowledge. Defendant's contention that the probative value of the settlements is substantially outweighed by the danger of unfair prejudice can be adequately addressed by instructing the jury that it may consider the evidence only for the purpose of assessing defendant's knowledge of the over-detention problem. See *Spell, supra,* 824 F.2d at 1400.

The same rationale does not support admission of the facts surrounding defendant's entry into the settlements or the amount of those settlements, however. These aspects of plaintiff's proposed proof do not tend to prove defendant's knowledge of an alleged over-detention problem at the Los Angeles County Jail. Moreover, even if they had some slight probative value in this regard, the court would exclude the evidence under Rule 403, because the danger of unfair prejudice to defendant would outweigh any probative value the facts have.

Accordingly, defendant's motion to exclude evidence of present and past offers compromise is granted in part and denied in part.

Plaintiff may admit evidence of the number of settlements into which defendant entered with persons allegedly over-detained at the Los Angeles County Jail to show that defendant was on notice that there was an over-detention problem at the facility. He may not offer any evidence regarding the circumstances under which defendant entered into the settlements or the amount of the settlements.

### F. Defendant's Motion *in Limine* No. 6 to Exclude Evidence of Purported Discovery Violations

Defendant next moves to exclude evidence of purported discovery violations he committed in this case. Defendant contends that he has acted in good faith during discovery and had substantial justification for the positions he took. He argues, however, that even if the Magistrate Judge were to issue an order finding that his conduct was not in good faith and/or not substantially justified, such a finding would not be relevant to the issues to be tried. Defendant further contends that, even if his purported discovery violations have a "scintilla" of relevance, they should be excluded under Rule 403 because their probative value is substantially outweighed by the danger of unfair prejudice and the possibility of delay. Plaintiff counters that evidence of the discovery violations is relevant and probative of his *Monell* claims because it shows consciousness of wrongdoing and an attempt by defendant to conceal evidence of over-detentions.

The docket indicates that on June 30, 2004, Magistrate Judge Margaret Nagle ordered defense counsel to produce summary computer-generated reports and computerized individual prisoner reports of over-detentions. On August 3, 2004, Judge Nagle heard further argument on the issue of sanctions and took the matter under submission. As Judge Nagle has not issued a final ruling regarding sanctions, the court need not consider whether plaintiff could introduce any order imposing sanctions as evidence showing consciousness of wrongdoing. Absent such an order, the court concludes that discovery disputes and initial failures to produce documents do not constitute admissible evi-

dence of consciousness of wrongdoing or efforts to conceal relevant evidence. See *Nation–Wide Check Corp., Inc. v. Forest Hills Distributors, Inc.,* 692 F.2d 214, 217–18 (1st Cir.1982) ("The general principles concerning the inferences to be drawn from the loss or destruction of documents are well established. When the contents of a document are relevant to an issue in a case, the trier of fact generally may receive the fact of the document's nonproduction or destruction as evidence that the party which has prevented production did so out of the well-founded fear that the contents would harm him"); see also *Akiona v. United States,* 938 F.2d 158, 161 (9th Cir.1991) ("Generally, a trier of fact may draw an adverse inference from the destruction of evidence relevant to a case"). The court presently has no evidence before it that defendant intentionally failed to produce documents in order to conceal them from plaintiff or that defendant destroyed documents that were responsive to plaintiff's document requests. Absent such evidence, the court concludes that the record is not sufficiently strong to support the inference of wrongdoing or concealment that plaintiff seeks to have drawn.[32]

Alternatively, the court finds that such evidence should be excluded under Rule 403. Even if some inference of consciousness of wrongdoing could be drawn from the manner in which defendant responded to plaintiff's discovery requests in this case, it would be a weak inference at best, given the lack of any evidence that documents were destroyed or altered, and the unfair prejudice that defendant would suffer from the admission of the evidence would clearly outweigh its probative value. Defendant's motion to exclude evi-

dence of purported discovery violations is therefore granted.

**G. Defendant's Motion *in Limine* No. 7 to Exclude Evidence of Employment History of Los Angeles County Sheriff's Department Personnel**

Defendant next moves for an order precluding plaintiff's counsel from arguing, or asking any witness questions regarding, the employment history of any Los Angeles County Sheriff's Department employee involved in the case or testifying at trial. This includes mention of any complaints regarding alleged misconduct.

Defendant's lengthy discussion of the California Penal Code § 832.7, which establishes an evidentiary privilege for peace officer personnel records, is not relevant in deciding the question. Questions of evidentiary privilege that arise in the course of adjudicating federal rights are governed by principles of federal common law. See *United States v. Zolin,* 491 U.S. 554, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989) (citing Rule 501 of the Federal Rules of Evidence).[33] Defendant cites the Ninth Circuit's decision in *Breed v. United States District Court,* 542 F.2d 1114, 1115 (9th Cir.1976), for the proposition that state law is a useful reference point in assessing assertions of privilege in federal cases. *Breed,* however, specifically states that the scope of an evidentiary privilege in a section 1983 civil rights action is a question of federal law. *Id.* ("The scope of an evidentiary privilege in a 42 U.S.C. § 1983 civil rights action is a question of federal law. [Citation.] State law may provide a useful referent, but it is not controlling. The contention that the doctrine of governmental privilege precludes disclosure of personnel

---

**32.** "The adverse inference is based on two rationales, one evidentiary and one not. The evidentiary rationale is nothing more than the common sense observation that a party who has notice that a document is relevant to litigation and who proceeds to destroy the document is more likely to have been threatened by the document than is a party in the same position who does not destroy the document.... The other rationale for the inference has to do with its prophylactic and punitive effects. Allowing the trier of fact to draw the inference presumably deters parties from destroying relevant evidence before it can

be introduced at trial." *Akiona, supra,* 938 F.2d at 161.

**33.** Rule 501 provides in relevant part: "Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in the rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision therefor shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in light of reason and experience."

records, whether or not established in California state courts, is not the law of this circuit").

In cases involving section 1983 claims, courts have repeatedly held that police personnel files and documents are relevant and discoverable. See, e.g., *Crawford v. Dominic*, 469 F.Supp. 260, 263 (E.D.Pa.1979) (holding that discovery of police personnel files in a § 1983 action was necessary to show supervisors' knowledge of and participation in the acts of their subordinates); *Unger v. Cohen*, 125 F.R.D. 67, 70 (S.D.N.Y.1989) ("Defendants argue in conclusory terms that these records are irrelevant to plaintiff's claims. The personnel records submitted for in camera inspection include information about the length of service and training of the individual defendants, as well as their periodic performance evaluations by superiors, department recognition and disciplinary actions taken. The information is clearly relevant in a § 1983 action arising out of alleged on-duty conduct").

Nonetheless, the court has no information regarding the nature of the personnel information about which plaintiff seeks to examine defense witnesses. Some aspects of the witnesses' employment history may well be relevant in assessing their credibility and/or as a form of impeachment evidence. Until plaintiff specifies the portions of the witnesses' employment history that he seeks to use, however, the court cannot determine the relevance of the information (generally or for impeachment purposes). Nor can it assess whether the probative value of the information is outweighed by its prejudicial impact. Plaintiff is accordingly directed to make an offer of proof, outside the presence of the jury, regarding any employment history evidence he seeks to use, so that the court may determine relevance under Rule 402 and prejudice under Rule 403. Defendant's motion for a blanket order excluding all such evidence, however, is denied.[34]

## H. Defendant's Motion *in Limine* No. 8 to Exclude Evidence of "Over-Detentions" of Non-Parolees

Defendant also seeks an order excluding evidence of alleged "over-detentions" of non-parolees at the Los Angeles County Jail. Having denied defendant's motion *in limine* to exclude all evidence of alleged over-detentions other than plaintiff's, the court now considers the extent to which such evidence should be limited to over-detentions of persons in positions similar to plaintiff. Defendant argues that any evidence of "over-detentions" should be limited to cases that reveal the practices and procedures utilized in releasing prisoners following the removal of a parole hold. He asserts that the policy followed in releasing non-parolees—e.g., those released in response to a court order directing their release, or upon the expiration of custodial sentence—is not relevant.

At the September 27, 2004 hearing, the court indicated that there was insufficient evidence in the record to permit a ruling on defendant's motion. The court therefore directed plaintiff to make an offer of proof specifying the type of evidence he intended to introduce regarding over-detentions, and directed defendant to make an offer of proof detailing the procedure followed by the Los Angeles County Sheriff's Department in re-

---

**34.** Citing *City of San Diego v. Superior Court*, 136 Cal.App.3d 236, 186 Cal.Rptr. 112 (1981), defendant argues that there is no purpose in protecting information in personnel files if it can be obtained and disclosed by asking officers to testify to their disciplinary history orally. *City of San Diego* is irrelevant. There, plaintiffs sought to depose two police officers as to whether they had been reprimanded for prior shootings or other violations. *Id.* at 238, 186 Cal.Rptr. 112. Plaintiffs had already sought discovery of the officers' personnel records; after an *in camera* inspection, the superior court ordered partial disclosure concerning a single shooting incident. Plaintiffs then sought to obtain the non-disclosed informa-

tion by deposing the officers. The Court of Appeal held that the statutes that protect personnel records also protect information regarding personnel history that is within the officers' personal recollections. *Id.* at 239, 186 Cal.Rptr. 112. *City of San Diego* stands for the unremarkable proposition that litigants cannot discover information contained in privileged documents by asking questions at a deposition. Here, defendant seeks to exclude all testimony regarding the employment history of all Sheriff's Department personnel, regardless of privilege or relevancy. *City of San Diego* does not support his position in this regard.

leasing inmates upon the removal of a parole hold. The court also directed defendant to specify how the policy governing release following removal of a parole hold differs from that policies that governs the release of prisoners in different circumstances. Having reviewed plaintiff's and defendant's offers of proof, the court addresses the merits of defendant's motion below.

The evidence plaintiff intends to offer regarding over-detentions includes (1) the Bobb Reports; which detail the number of over-detentions in each of the five fiscal years preceding 2001; (2) back-up documents to the Bobb Reports, which detail the number of incidents designated as over-detentions by defendant between June 1999 and June 2001; and (3) Los Angeles County Sheriff's Department computer-generated summaries of over-detentions for the period from July 6, 1996, through July 5, 2001. Defendant contends the Bobb Reports are inadmissible because they do not distinguish between purported over-detentions of parolees and non-parolees. Plaintiff counters that the distinction between parolees and non-parolees is irrelevant to his argument that defendant's implementation of jail release policies, or his lack of such policies, caused plaintiff's release to be unreasonably delayed.

Both in his briefs and through statements of counsel at earlier hearings, plaintiff has asserted that he intends to advance a theory of liability similar to that argued by plaintiffs in *Berry v. Baca, supra,* 379 F.3d 764. In *Berry,* which involved three consolidated over-detention cases, the Ninth Circuit reversed the district court's grant of summary judgment, holding that there were triable issues of fact as to whether the manner in which the County implemented its jail release policies showed deliberate indifference to plaintiffs' constitutional rights. *Id.* at 773. In so holding, the Ninth Circuit distinguished its earlier decision in *Brass, supra,* 328 F.3d 1192, which affirmed the district court's grant of summary judgment in favor of Los Angeles County in an over-detention case challenging two specific policies that governed the release of prisoners in response to a court order. The court explained that unlike the plaintiff in *Brass,* the plaintiffs in *Berry* did not challenge individual policies, but rather the implementation of the policies. *Berry, supra,* 379 F.3d at 768. Specifically, they argued that "the County's unreasonably inefficient implementation of its administrative policies amount[ed] to a policy of deliberate indifference to their constitutional rights." *Id.*

Plaintiff asserts that *Berry* allows him to challenge defendant's implementation of all jail release policies "in toto," whether the implementation of the policies could have caused, or is even related to, plaintiff's over-detention. *Berry* does not stand for such a proposition. Rather, the court in *Berry* specifically noted that plaintiffs challenged the implementation of policies that governed the release of prisoners following judicial determinations of innocence and that caused delays in the release of such prisoners. *Berry, supra,* 379 F.3d at 768 ("Both parties agree that the County has a set of administrative policies that guide releases after judicial determinations of innocence. Both parties also agree on step four: these policies resulted in delays in the release of each of the plaintiffs, ranging from twenty-six to twenty-nine hours after their court-ordered release").[35] The court's use of the phrase "in toto" simply reflects that fact that there were numerous administrative procedures and policies that governed the release of inmates in response to a court order. See *id.* ("[T]here is a crucial distinction between the challenge to specific policies in *Brass* and the challenge to the implementation of the policy 'in toto' in this case. It cannot be the case that, if the County's system of administratively processing releases took several days or weeks to complete, its policy could not be challenged as one of 'deliberate indifference' simply because each of the administrative *procedures*

---

**35.** Of the three plaintiffs in *Berry,* only Roger Mortimer was ordered released following return of a not guilty jury verdict. *Berry, supra,* 379 F.3d at 766–67. The Superior Court directed that Rodney Berry be released after dismissing the charges against him. *Id.* at 766. The Ninth Circuit did not state the reason for Anthony Hart's release. Even if his release was not the result a "judicial determination of innocence," however, it was based on a court-order directing his release.

*employed* is theoretically reasonable" (emphasis added)). Plaintiff cannot challenge the implementation of policies that do not guide, and that have no effect on, the release of inmates incarcerated due to parole holds. Even if a jury were to find that the implementation of such other policies reflected deliberate indifference, it would have no basis to find that defendant's deliberate indifference in implementing those policies was a moving force behind plaintiff's over-detention. This is because the policies themselves did not govern, and were not applied, in effecting plaintiff's release.

Thus, if the policies that guide the release of inmates following the removal of parole hold differ significantly from the policies that govern the release of inmates in different circumstances, evidence of such other over-detentions would be irrelevant in proving causation or deliberate indifference. In *Oviatt v. Pearce,* plaintiff brought a section 1983 action that challenged the sheriff's policy as respects over-detentions caused by missed arraignments. See *Oviatt, supra,* 954 F.2d at 1477 ("There is also no question that the decision not to take any action to alleviate the problem of detecting missed arraignments constitutes a policy for purposes of § 1983 municipal liability. Sheriff Pearce knew that some inmates were not arraigned in the time required by Oregon law, but decided not to create any procedure to remedy the problem"). The Ninth Circuit's description of the policy in question was specific to over-detentions following missed arraignments; it did not address over-detentions generally. See *id.* at 1478 ("In the instant case, the jury reasonably found that Multnomah County, through its policymaker Sheriff Pearce, was 'deliberately indifferent' to the right of detainees not to be incarcerated without prompt pretrial procedures. Sheriff Pearce knew that some inmates could not communicate their plight or were out of touch with their families or lawyers. He also knew that 'from time to time' some inmates remain incarcerated for a period of time because they missed their arraignments. Specifically, Sheriff Pearce knew of at least 19 incidents between 1981 and 1989 in which individuals sat in jail for periods of undetermined length after they missed arraignment").

Here, however, defendant has failed to demonstrate that there is any significant difference between the policies that govern the release of parolees following removal of a parole hold and those that govern the release of inmates in other circumstances. Defendant has proffered a declaration from Curtiss Burnett, the Records Lieutenant for the Inmate Reception Center ("IRC"). The IRC is a unit within the Los Angeles County Sheriff's Department Correction Services Division, which is responsible for booking inmates into custody at all division housing facilities.[36] Although Burnett details the County's release policies, he fails to identify any significant difference between the policies that governed plaintiff's release and those that guided the release of non-parolees in 2001. Burnett states, for instance, that pre–1999 procedure for processing paperwork for inmates returning from court did not affect inmates incarcerated as the result of a parole hold.[37] This is irrelevant, however, as plaintiff's alleged over-detention occurred in 2001. Burnett also contends that once a parole hold release is entered into the jail's computer system, a number of quality control checks are required to determine if the inmate is release-eligible, e.g., checking for additional holds, reviewing the inmate's hard copy booking jacket, and in some cases, having the release reviewed by a clerical supervisor.[38] At an earlier point in his declaration, however, Burnett states that the same procedures apply to all inmates being released, not just parolees whose parole holds

---

**36.** Declaration of Curtiss Burnett ("Burnett Decl"), ¶¶ 2–3.

**37.** *Id.,* ¶ 15.

**38.** *Id.,* ¶ 16 ("These control checks include checking to see if there are any other existing charges of holds in the computer system which

would require an inmate to remain in custody, pulling the inmate's hard copy book jacket to determine if any additional information contained within the booking jacket would require an inmate to remain in custody and, in some cases, review of the release information by a clerical supervisor").

have been removed.[39]

The only real difference that Burnett identifies is the fact that, at the time of plaintiff's alleged over-detention, the computer systems in the courthouse and the jail were not linked. As a result, it was necessary to send court-generated release paperwork back to the Los Angeles County Jail with the inmates when they were returned from court. Burnett states that "[b]etween the time of the court-authorized release and their actual release, these inmates might have spent time in the court lock-up before being transported back to their housing location."[40] Inmates being released following the removal of a parole hold did not experience this type of delay.[41] Burnett does not specify, however, the frequency with which inmates remained for any substantial period of time in court lock-up, or the length of their confinement there before being returned to the jail. Indeed, Burnett's use of the word "might" indicates that he has no specific information regarding the amount of additional time that prisoners may have spent at the time court

before being returned to the jail.[42] Based on the record before it, therefore, the court cannot find that the differences between the policies that governed the release of parolees in 2001 and those that governed the release of other inmates are so significant that they justify excluding evidence regarding the over-detention of non-parolees.[43]

As noted, however, Barnett states that, prior to 1999, there were significant differences between the policies governing the release of parolees and those governing the release of non-parolees. Specifically, Barnett states that the IRC did not begin to process each day's paperwork on court-ordered releases until the end of the day when the last bag of paperwork was received.[44] He asserts that this policy did not affect inmates such as plaintiff, who was incarcerated due to a parole hold, because releases pursuant to parole hold removals were processed upon receipt of a teletype from the California Department of Corrections.[45] This distinction is significant, as reflected in

---

**39.** *Id.,* ¶ 12 ("[T]he processing [of] paperwork for release involved the update of information into the jail's computer system .... [O]nce the release information had been updated, a clerk had to verify the information contained within the computer system to make sure there [were] no outstanding cases, wants or holds for the inmate. Then the clerk had to manually review the hard copy of the inmate's record jacket to make sure that the information in the computer system [was] accurate.... Moreover, depending on the nature of the inmate's charge, two to four additional quality control checks of the inmate's record jacket by clerical and/or sworn personnel are required to make sure that the inmate should be released").

**40.** *Id.,* ¶ 17.

**41.** *Id.*

**42.** At the January 10, 2005 hearing, defendant's counsel argued that even if an inmate did not spend time in court lock-up following a court-ordered release, he or she would have to be transported back to the Los Angeles County Jail, making some delay in release unavoidable. Defendant has not, however, proffered any evidence regarding the average amount of time required to transport inmates back to the jail at the time of plaintiff's alleged over-detention. Assuming *arguendo* that some inmates spent several hours in transit from court to county jail, such a factor would not serve to explain lengthy over-detentions, such the twenty-six and twenty-nine hour

delays experienced by the plaintiffs in *Berry*. Moreover, whether some over-detentions are attributable to transportation delays goes to the weight of the evidence, and is an argument that should be directed to the jury.

**43.** Barnett states that of the 1,752 inmates over-detained between July 6, 1996, and July 5, 2001, only seventeen were parolees like plaintiff who were incarcerated due to a parole hold. Barnett states that these numbers reflect the differences in release processes for parolees and those for other prisoners. (*Id.,* ¶ 18). Given defendant's inability to identify any significant differences in the policies that guided the release of parolees and those that guided the release of other inmates, however, the court does not believe that the relative numbers of parolees and non-parolees who were over-detained warrants the exclusion of all evidence of over-detentions of non-parolees. Indeed, if parolees made up only 4.3% of the jail population during this period, as Barnett contends, then one would expect that no more than seventy-five of the over-detained inmates would be parolees. Viewed in this light, the fact that only seventeen of the inmates allegedly over-detained were parolees is less significant, and at most goes to the weight of the evidence rather than its admissibility.

**44.** *Id.,* ¶ 14.

**45.** *Id.,* ¶ 15.

the portions of the Bobb Reports that plaintiff seeks to introduce. These reports indicate that there was a significant decline in the number of over-detentions during the 1999–2000 and 2000–2001 fiscal years,[46] suggesting that the change in policy regarding the processing of release paperwork from the court substantially reduced the number of over-detentions. For these reasons, the court finds that evidence of over-detentions prior to the 1998–1999 fiscal year, to the extent it is not specific to the over-detention of parolees, does not tend to prove whether defendant's implementation of release policies in 2001 showed deliberate indifference to plaintiff's constitutional rights. Moreover, any probative value that the evidence might have would be substantially outweighed by the danger of unfair prejudice and jury confusion. Fed.R.Evid. 403. Accordingly, defendant's motion to preclude evidence of over-detentions of non-parolees is granted as respect over-detentions that occurred prior to the 1998–1999 fiscal year. Defendant's motion is denied in all other respects.

### I. Defendant's Motion *in Limine* No. 9 To Preclude Testimony of Sheriff Leroy Baca

Defendant next moves to preclude plaintiff from calling him to testify at trial. Defendant, who is being sued in his official capacity as the Los Angeles County Sheriff, states that he does not have personal knowledge of the circumstances of plaintiff's incarceration, and did not directly supervise or train any of the involved personnel.[47] Defendant contends that as the Sheriff of the largest sheriff's department in the world, he necessarily delegates the supervision of day-to-day operations to others within the department.[48] Plaintiff counters that he has a legal right to choose whom he names as a defendant, that Baca is a proper defendant, and that it is the implementation of Baca's policies that forms the basis of his claim.

■ The need to limit the use of subpoenas served on high government officials was

recognized by the Supreme Court in *United States v. Morgan*, 313 U.S. 409, 421–22, 61 S.Ct. 999, 85 L.Ed. 1429 (1941). There, the district court allowed plaintiffs to take the deposition of the Secretary of Agriculture regarding decisions made in his official capacity, and subsequently to call him to testify at trial. The Court stated that this type of examination of a high government official threatened to undermine the "integrity of the administrative process." *Id* at 422, 61 S.Ct. 999. Other courts have recognized that high public officials "should not, absent extraordinary circumstances, be called to testify regarding their reasons for taking official actions.'" *In re United States*, 985 F.2d 510, 512 (11th Cir.1993)(quoting *Simplex Time Recorder Co. v. Secretary of Labor*, 766 F.2d 575, 586 (D.C.Cir.1985)); see *Kyle Eng. Co. v. Kleppe*, 600 F.2d 226, 231–32 (9th Cir.1979) ("Heads of government agencies are not normally subject to deposition and the district court's order directing [the Administrator of the Small Business Administration] to answer interrogations in lieu of a deposition does not appear unreasonable" (internal citation omitted)); *Warzon v. Drew*, 155 F.R.D. 183, 185 (E.D.Wis.1994)("In general, high ranking government officials enjoy limited immunity from being deposed in matters about which they have no personal knowledge. The immunity is warranted because such officials must be allowed the freedom to perform their tasks without the constant interference of the discovery process"). "An exception to this general rule exists concerning top officials who have direct personal factual information pertaining to material issues in an action ... [and] where the information to be gained .. is not available through any other source." *Church of Scientology of Boston v. I.R.S.*, 138 F.R.D. 9, 12 (D.Mass.1990); see also *Nagle v. Superior Court*, 28 Cal.App.4th 1465, 34 Cal.Rptr.2d 281 (1994)(holding that the directors of the California Employment Development Department and the California Department of Health Services were not subject to deposi-

---

46. Plaintiff's Offer Of Proof, Exh. 1 ("13th and 14th Reports By Merrick Bobb & Staff") at 12, 17.

47. Declaration of Leroy D. Baca ("Baca Decl."), ¶¶ 3–4.

48. *Id.*, ¶ 2.

tion where plaintiff made no showing that either director had personal knowledge of matter at issue or that information could not be obtained through less burdensome means).

Plaintiff advances a number of arguments as to why defendant should be called to testify. He asserts that he is the "master of his complaint," and has a legal right to choose whom he names as a defendant. The cases plaintiff cites to support this proposition, however, involved the denial of motions to designate the City or County of Los Angeles as defendant in actions where plaintiffs sued Sheriff Baca or other municipal officials in their official capacities. See e.g., *Bell v. Baca*, No. CV0102067, 2002 WL 368532, *2 (C.D.Cal. Feb.26, 2002). The cases do not address whether, and when, a sheriff or other municipal official should be required to testify.

■ Plaintiff next argues that Baca is a proper defendant. Although this is true, official-capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell, supra*, 436 U.S. at 690, n. 55, 98 S.Ct. 2018; *Kentucky v. Graham*, 473 U.S. 159, 167, n. 14, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) ("There is no longer a need to bring official-capacity actions against local government officials, for under *Monell* ... local government units can be sued directly for damages and injunctive or declaratory relief"). Plaintiff's suit against defendant in his official capacity is, for all intents and purposes, a suit against the County of Los Angeles.

There is no dispute, however, that as Los Angeles County Sheriff, defendant is the final policymaker for the County in setting and implementing jail release policies. See *Streit v. County of Los Angeles*, 236 F.3d 552, 564–65 (9th Cir.2001) ("[W]e conclude that the LASD acts as the final policymaker for the county when administering the County's release policy and not in its state law enforcement capacity"); *Cortez v. County of Los Angeles*, 294 F.3d 1186, 1187 (9th Cir.2002) ("[W]e hold that the Los Angeles County Sheriff ('Sheriff') acts as the final policymaker for the County of Los Angeles ('County') in establishing and implementing policies and procedures for the safekeeping of inmates in the county jail"); see also *Brewster v. Shasta County*, 275 F.3d 803, 812 (9th Cir.2001) ("In sum, we conclude that the Shasta County Sheriff acts as a final policymaker for the County when investigating crime within the County").

■ Plaintiff challenges defendant's implementation of jail release policies. Defendant does not assert that he has no knowledge of such policies, but only that he does not have "detailed knowledge of the specific procedures involved in the release of inmates held solely pursuant to a 'parole hold placed by the California Department of Corrections.'"[49] As discussed earlier, plaintiff does not challenge specific procedures, but rather the implementation of the policies that govern the release of parolees and other inmates "in toto." See *Berry, supra*, 379 F.3d at 768. Thus, unlike other official capacity suits, it cannot be said that Baca has no personal knowledge of the facts at issue.

Further, at least one court has suggested that police chiefs, and presumably sheriffs as well, do not constitute high government officials. *Detoy v. City and County of San Francisco*, 196 F.R.D. 362, 369–70 (N.D.Cal. 2000)("A chief of police is not necessarily a high government official as in the cases cited by Defendants. Research by the court reveals several cases where police chiefs were deposed, without any special showing"). Defendant has cited no authority to the contrary.[50] Although it may well be appropriate

---

49. *Id.*, ¶ 3.

50. With the exception of *Detoy*, which does not support defendant's position, the cases cited by defendant all involved high ranking state and federal executive officers. See *Kyle Eng. Co., supra*, 600 F.2d 226 (Administrator of the Small Business Administration); *In re F.D.I.C.*, 58 F.3d 1055 (5th Cir.1995) (Board of Directors of the Federal Deposit Insurance Corporation); *In re United States, supra*, 985 F.2d 510 (Commissioner of Food and Drug Administration); *Alexander v. FBI*, 186 F.R.D. 1 (D.D.C.1998)(Officers of the Executive Office of the President); *Warzon, supra*, 155 F.R.D. 183 (Governor of Wisconsin and the Wisconsin Secretary of Department of Administration); *Church of Scientology, supra*, 138 F.R.D. 9 (Internal Revenue Service Director of

to limit defendant's testimony so as to avoid unnecessary interference with his official responsibilities, the court does not believe that precluding his testimony altogether is warranted. See *Union Savings Bank of Patchogue, New York v. Saxon,* 209 F.Supp. 319, 320 (D.D.C.1962) (limiting the deposition of the Comptroller of Currency to the procedural action taken by him in connection with the subject matter of the action).

In sum, because Baca is the named defendant in this case, and has not demonstrated that he lacks personal knowledge of relevant facts, his motion to preclude plaintiff from calling him as a witness is denied.

### J. Defendant's Motion *in Limine* No. 10 To Preclude Testimony By Merrick Bobb And The Custodian Of Records Of Merrick Bobb Reports

Defendant next moves to preclude plaintiff from calling Merrick Bobb and the Custodian of Records of the Merrick Bobb Reports. Defendant contends that other than authenticating the Bobb Reports and possibly providing a general description of his investigative activities, there is nothing to which Bobb could testify that would be relevant and not protected by the attorney-client, work product and/or official information privileges. Defendant also contends that Bobb is unable to testify due to illness. Defendant additionally seeks to exclude the testimony of Bobb and the Custodian of Records for the Bobb Reports on the grounds that the information in the reports is irrelevant and prejudicial. Plaintiff counters that Bobb's testimony is not privileged and is highly relevant to his claims. Plaintiff also contends that defendant has not made an adequate showing that Bobb is physically unable to testify due to his illness.

#### 1. Attorney–Client Privilege

 Defendant first argues that Bobb's communication with County officials and employees fall squarely within the attorney-client privilege. Bobb's contract provides that he was retained by the County to pro-

vide confidential legal advice on various issues relating to the Sheriff's Department. Defendant contends, therefore, that any conversations Bobb may have had with County officials and/or employees during the course of his investigation, and any advice he ultimately rendered, is protected by the attorney-client privilege. He asserts that Bobb's communication with the County did not lose their privileged status as a result of his issuance of the Bobb Reports, since the reports were published with the County's consent and do not reveal the substance of any confidential communications. Plaintiff counters that defendant has not established any of the elements of the attorney-client privilege or even that an attorney-client relationship exists between Bobb and the County. Plaintiff contends that he seeks to examine Bobb on the work he and his staff performed as fact finders.

 "The fact that a person is a lawyer does not make all communications with that person privileged." *United States v. Martin,* 278 F.3d 988, 999 (9th Cir.2002). "Because it impedes full and free discovery of the truth, the attorney-client privilege is strictly construed." *Id.* (quoting *Weil v. Investment/Indicators, Research & Management, Inc.* 647 F.2d 18, 24 (9th Cir.1981)). The Ninth Circuit has held that the attorney-client privilege has eight essential elements: "(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived." *Matter of Fischel,* 557 F.2d 209, 211 (9th Cir.1977)(quoting 8 John H. Wigmore, EVIDENCE, § 2292, at p. 554 (McNaughton Rev.1961)); see also *Martin, supra,* 278 F.3d at 999; *In re Grand Jury Investigation,* 974 F.2d 1068, 1071, n. 2 (9th Cir.1992). "The party asserting attorney-client privilege has the burden of establishing all of the elements of the privilege."

Exempt Organizations Technical Division); *Nagle, supra,* 28 Cal.App.4th 1465, 34 Cal.Rptr.2d 281 (Directors of California Employment Devel-

opment Department and the Department of Health Services).

*United States v. Munoz,* 233 F.3d 1117, 1128 (9th Cir.2000).

 In order to assert the attorney-client privilege, defendant must show that the County had an attorney-client relationship with Bobb. See *Martin, supra,* 278 F.3d at 1000. As stated above, because defendant is being sued in his official capacity, he is essentially a surrogate for the County in this action. See *Butler, supra,* 281 F.3d at 1026 n. 9. Bobb has submitted a declaration stating that the County retained him as "Special Counsel to review the LASD and its operations and activities so that the Special Counsel might, among other things, render legal advice and make confidential recommendations to the County as to such matters, with particular attention to areas of potential litigation risk or exposure."[51] Bobb's contract provides that "[a]s counsel to the County of Los Angeles, Special Counsel shall have access on an attorney client basis to such confidential records of the County of Los Angeles, its Departments and Officers as may be material and relevant to his inquiry. All public reports shall preserve all statutory and constitutional requirements of confidentiality with regard to records and individuals."[52] The contract also states that "any reports concerning specific individuals shall be made solely to the Sheriff on an attorney client basis."[53] Defendant, therefore, has adequately demonstrated the existence of an attorney-client relationship between Bobb and the County.

 The fact that an attorney-client relationship exists between Bobb and the County does not mean that all information in Bobb's possession is privileged, however. A party claiming attorney-client privilege must identify specific information and communications that are privileged and the grounds supporting invocation of the privilege for each allegedly privileged piece of evidence. *Martin, supra,* 278 F.3d at 1000. Blanket assertions of the privilege are "extremely disfavored." *Id.; Clarke v. Am. Commerce National Bank,* 974 F.2d 127, 129 (9th Cir. 1992). "Such assertions disable the court and the adversary party from testing the merits of the claim of privilege." *United States v. El Paso Co.,* 682 F.2d 530, 541 (5th Cir.1982).

Without knowing the specific information plaintiff intends to elicit through Bobb's testimony, the court cannot determine if the other elements of the attorney-client privilege are satisfied. In his List of Witnesses and Estimated Times, plaintiff indicates that he intends to question Bobb regarding the "over-detention statistics set forth in [the] Bobb Reports, including [the] accuracy of and basis for [those statistics and] authentication of [the] Bobb Reports."[54] Defendant has made no showing that the over-detention statistics set forth in the Bobb reports derive from privileged communications between Bobb and County employees or represent legal advice Bobb gave the County. Indeed, it would appear that the statistics are merely a compilation of information contained in records of the type that defendant has been ordered to produce during discovery in this case. See *Upjohn Co. v. United States,* 449 U.S. 383, 395–96, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981) (" '[T]he protection of the privilege extends only to communications and not to facts. A fact is one thing and a communication concerning that fact is an entirely different thing. The client cannot be compelled to answer the question, "What did you say or write to the attorney?" but may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney,' " quoting *Philadelphia v. Westinghouse Electric Corp.,* 205 F.Supp. 830, 831 (E.D.Pa.1962)). Because defendant has not met his burden of showing that any and all testimony by Bobb would fall within the protection of the attorney-client privilege, the court cannot exclude Bobb's testimony on

51. Declaration of Merrick John Bobb ("Bobb Decl."), ¶ 6.

52. Defendant's Motion in Limine Nos. 1–9, Exh. B ("Contract for Special Counsel"), ¶ 1(B).

53. *Id.,* ¶ 1(c).

54. Plaintiff's List of Witnesses with Estimated Times and Summary of Testimony.

this basis.[55]

### 2. The Work Product Doctrine

 Defendant next argues that any testimony by Bobb regarding the specifics of the work he performed as Special Counsel would constitute privileged work product. He contends that any effort by plaintiff to elicit testimony regarding Bobb's mental impressions, opinions and conclusions, and/or documents reflecting such impressions, opinions and conclusions, would also run afoul of the work product doctrine. Plaintiff counters that because Bobb and his staff were acting as fact finders, not attorneys, the Bobb Reports do not constitute work product. Plaintiff also contends that even if the data and processes employed by Bobb and his staff constitute privileged work product, he should nevertheless be permitted to question Bobb since he has shown a substantial need for the information and is unable to obtain it from other sources without undue hardship.

 Under the work product doctrine outlined in Rule 26(b)(3) of the Federal Rules of Civil Procedure, a party may not discover materials prepared in anticipation of litigation by an opposing party's counsel unless the party has "substantial need" for the materials and is "unable without undue hardship to obtain the substantial equivalent of the materials by other means." FED.R.CIV.PROC. 26(b)(3). "The work product doctrine attempts to strike a balance between the policy of open discovery and an attorney's need to analyze and prepare a client's case without interference or free-riding by an opposing party." *Fletcher v. Union Pacific R.R. Co.,* 194 F.R.D. 666, 670 (S.D.Cal.2000). The Ninth Circuit has held that to qualify for protection against discovery under Rule 26(b)(3), material must have two characteristics: (1) it must be prepared in anticipation of litigation or for trial; and (2) it must be prepared by or for another party or by or for that other party's representative. *In re Grand Jury Subpoena (Mark Torf/Torf Environmental Management),* 357 F.3d 900,

907 (9th Cir.2004). "The burden of establishing protection of materials as work product is on the proponent, and it must be specifically raised and demonstrated rather than asserted in a blanket fashion." *Southern Union Co. v. Southwest Gas Corp.,* 205 F.R.D. 542, 549 (D.Ariz.2002); see *Wyoming v. U.S. Dept. of Agriculture,* 239 F.Supp.2d 1219, 1231 (D.Wyo.2002) ("A blanket claim as to the applicability of the work product doctrine will not satisfy this burden").

 Because the work-product doctrine is not an absolute privilege, but a qualified one, a party may overcome the doctrine by a sufficient showing of need. There are two types of work product, ordinary work product and opinion work product. The standard for overriding the work-product privilege depends on the type of product sought. Fact work product is discoverable only upon a showing of substantial need and an inability to secure a substantial equivalent by alternate means without undue hardship. See *McKenzie v. McCormick,* 27 F.3d 1415, 1420 (9th Cir.1994). Opinion work product, including the mental impressions, conclusions, opinions, or legal theories of an attorney, is entitled to nearly absolute protection, and is only discoverable upon a showing of "necessity and unavailability by other means." *Id.*

Like his claim of attorney-client privilege, defendant's blanket invocation of the work product doctrine is not a sufficient basis to exclude Bobb's testimony in it entirety. See *DIRECTV, Inc. v. Puccinelli,* 224 F.R.D. 677, 681 (D.Kan.2004) ("A 'blanket claim' as to the applicability of the ... work product doctrine does not satisfy the burden of proof"); *Disidore v. Mail Contractors of America, Inc.,* 196 F.R.D. 410, 413 (D.Kan. 2000) ("Defendant has the burden of establishing that the work product doctrine applies. To carry that burden, Defendant must make a 'clear showing' that the asserted objection applies. A 'blanket claim' as to the applicability of the work product doctrine does not satisfy the burden of proof" (citations omitted)). Because defendant has not

---

**55.** Because defendant has not shown that the attorney-client privilege precludes all testimony that Bobb could give, the court need not consider whether any privilege that existed has been waived as respects information contained in the Bobb Reports.

met his burden of proof respecting the applicability of the work product doctrine, the court cannot exclude Bobb's testimony on that basis.[56]

### 3. Official Information Privilege

Defendant next argues that any attempt by plaintiff to elicit testimony from Bobb about the contents of confidential documents and materials that he reviewed in his role as Special Counsel would be prohibited by the official information privilege. Federal common law recognizes a qualified privilege for official information. *Sanchez v. City of Santa Ana,* 936 F.2d 1027, 1033 (9th Cir. 1990). "Because this privilege is based upon the state's interest in protecting against public disclosure of sensitive information, courts examining a claim of privilege will balance the plaintiff's interest in disclosure against the government's interest in keeping the information secret." *Price v. County of San Diego,* 165 F.R.D. 614, 620–21 (S.D.Cal.1996). When the official information privilege is asserted in response to a discovery request, court have held that "the responsible official within the agency who has personal knowledge regarding the material must submit a declaration that: (1) affirms that the agency has collected the material and held it in confidence; (2) affirms that he or she has reviewed the material; (3) specifically asserts the governmental or privacy interest which would be threatened by disclosure of the material; (4) specifically explains the substantial risk of harm to those interests which would result from disclosure; and (5) estimates the amount of harm which would result from disclosure." *Id.;* see also *Chism v. County of San Bernardino,* 159 F.R.D. 531, 533 (C.D.Cal.1994); *Kelly v. City of San Jose,* 114 F.R.D. 653, 670 (N.D.Cal.1987). Accordingly, a party may not make a blanket objection on the basis of the official information privilege, but must make a "specific claim of the rationale of the claimed privilege." *Price, supra,* 165 F.R.D. at 621.

For the reasons stated above, defendant has not met his burden of demonstrating that the official information privilege applies, and the court cannot exclude Bobb's testimony in its entirety on this basis.

### 4. Bobb's Illness

Defendant finally contends that due to illness, Bobb is unable to testify as a witness in this case. In his declaration, Bobb states that he was diagnosed with Guillain–Barre syndrome in June 2003, and was subsequently hospitalized from October 2003 until June 2004. As a result of his condition, Bobb's arms and feet are paralyzed, and he is unable to move without assistance. Bobb represents that he receives extensive medical treatment each day, including physical therapy, occupational therapy and range of motion exercises. Bobb states that his condition and ongoing medical treatment make it impossible for him to testify in the instant case. Plaintiff argues that Bobb has not made an adequate showing that he is physically unable to testify, nor demonstrated that having to rearrange his physical therapy appointments would be so burdensome that he cannot be called as a witness at trial.

Bobb's medical condition is serious, and the court has no reason to doubt his assertion that he is unable to testify in this case. At the same time, defendant has cited no authority indicating that a party may move to exclude the testimony of a third party witness on the grounds that the witness is physically unable to testify. The more appropriate procedure would be for Bobb to file a motion to quash if and when he is served with a trial subpoena. Rule 45(c)(3) of the Federal Rules of Civil Procedure provides that "[o]n timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it ... subjects a person to undue burden." FED.R.CIV. PROC. 45(c)(3)(A)(iv). "[W]hether a subpoena is burdensome depends on the facts of the case." *Hussey v. State Farm Lloyds Ins. Co.,* 216 F.R.D. 591, 596 (E.D.Tex.2003). "'[T]he burden of persuasion in a motion to quash a subpoena issued in the course of civil litigation is borne by the movant.'" *Concord*

---

**56.** Nor, in light of defendant's failure, need the court consider whether plaintiff has made a sufficient showing of need to permit the questioning, or whether by publishing the Bobb Reports, Bobb waived any work product privilege that might otherwise have attached.

*Boat Corp. v. Brunswick Corp.*, 169 F.R.D. 44, 48–49 (S.D.N.Y.1996) (quoting *United States v. International Business Machines Corp.*, 83 F.R.D. 97, 104 (S.D.N.Y.1979)). "The party issuing the subpoena must demonstrate[, in turn,] that the information sought is relevant and material to the allegations and claims at issue in the proceedings." *Night Hawk Ltd. v. Briarpatch Ltd., L.P.*, No. 03 Civ.1382, 2003 WL 23018833, *8 (S.D.N.Y. Dec. 23, 2003).

As noted, it is unclear what specific evidence plaintiff hopes to elicit from Bobb. Although plaintiff indicates that he intends to call Bobb to authenticate the Bobb Reports, he apparently intends to call the Custodian of Records for the same purpose. Plaintiff asserts that he cannot prove his case without reference to the Bobb Reports and the back-up data and computer-generated reports that form the basis for the statistics set forth in the reports. Bobb states in his declaration that he does not have any specific recollection of the interviews and document reviews on which he relied in preparing these portions of the Bobb Reports.[57] It is unclear, therefore, how Bobb's testimony could augment the information contained in the reports. Given these facts, as well as Bobb's representations regarding the seriousness of his condition, it appears to the court that Bobb can make a strong showing that requiring his testimony in this case would constitute an undue burden. If and when Bobb is subpoenaed and moves to quash the subpoena, the court will consider any further medical evidence Bobb may submit regarding his ability to testify over a four hour period in court, and regarding the impact of any disruption of his daily physical/occupational therapy regime. The court will also consider any particularized showing that plaintiff makes regarding his need for Bobb's testimony. At present, however, the court concludes that defendant's motion to exclude Bobb's testimony is procedurally improper and denies it on that basis.

### 5. Conclusion Regarding Motion to Exclude Merrick Bobb's Testimony

Defendant's motion to exclude the testimony of Merrick Bobb on the grounds that it is privileged or that it would invade the attorney work product doctrine is denied. Defendant's motion to exclude the testimony of Bobb and the Custodian of Records of the Bobb Reports on the grounds that the reports are irrelevant and prejudicial is denied for the reasons stated in Section C. Defendant's motion to exclude Bobb's testimony on the basis that he is medically unable to testify at trial is procedurally improper and premature (as there is no evidence he has yet been subpoenaed).

### K. Defendant's Motion *in Limine* No. 11 to Preclude Testimony of Evelyn Larrubia, Nicholas Riccardi, Gloria Molina and Leroy Baca as Part of References to Media Accounts of Overdetentions

Defendant next moves to preclude the testimony of Evelyn Larrubia, Nicholas Riccardi,[58] Gloria Molina and Leroy Baca in connection with references to media accounts of over-detentions.[59] Defendant also seeks to preclude the testimony of Larrubia, Riccardi, and Molina on the grounds that plaintiff did not list them as witnesses until after the discovery cut-off date had passed. On February 3, 2003, pursuant to Rule 16 of the Federal Rules of Civil Procedure, the court issued a scheduling order in this case, and set an August 15, 2003, discovery cut-off date. This deadline was later extended to October 17, 2003. Defendant contends that because plaintiff did not add these witnesses to his witness list until September 15, 2004, long after Rule 26 disclosures were due and after the discovery cut-off date had passed, defendant has not had an opportunity to

---

57. Bobb Decl., ¶ 9.

58. Defendant's Motion, and Plaintiff's Witness List, incorrectly identifies Riccardi as Riccardo.

59. The court has already addressed defendant's motion to exclude evidence of the newspaper articles regarding over-detentions at Los Angeles County Jail. To the extent defendant now seeks to preclude the authors of those articles from testifying to facts of which they have personal knowledge merely because they are referenced in the articles, defendant's motion is without merit.

depose the witnesses. He asserts that any attempt to do so now would be untimely. Accordingly, he argues that their testimony should be precluded at trial.

Rule 26(a)(1)(a) provides that "a party must, without awaiting a discovery request, provide to other parties: the name and, if known, the address and telephone number of each individual likely to have discoverable information that the disclosing party may use to support its claims and defenses, unless solely for impeachment, identifying the subjects of the information." FED.R.CIV. PROC. 26(a)(1)(A). Rule 26(e) provides that litigants have a continuing duty to supplement their disclosures under Rule 26(a). FED.R.CIV.PROC. 26(e)(1). Excluding evidence at trial as a sanction for failure to make timely disclosure under Rule 26(e)(1) is " 'automatic and mandatory' unless the party can show the violation is 'either justified or harmless.' " *Miksis v. Howard,* 106 F.3d 754, 760 (7th Cir.1997); see also *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.,* 259 F.3d 1101, 1106 (9th Cir.2001) ("Rule 37(c)(1) gives teeth to these requirements by forbidding the use at trial of any information required to be disclosed by Rule 26(a) that is not properly disclosed.... This particular subsection, implemented in the 1993 amendments to the Rules, is a recognized broadening of the sanctioning power.... The Advisory Committee Notes describe it as a 'self-executing,' 'automatic' sanction to 'provide[ ] a strong inducement for disclosure of material....' Courts have upheld the use of the sanction even when a litigant's entire cause of action or defense has been precluded.... Two express exceptions ameliorate the harshness of Rule 37(c)(1): The information may be introduced if the parties' failure to disclose the required information is substantially justified or harmless"); *Self–Insurance Institute of America, Inc. v. Software and Information Industry Ass'n.,* 208 F.Supp.2d 1058, 1066 (C.D.Cal.2000) ("Rule 37(c)(1) precludes the use of evidence not disclosed as required under Rule 26(a) or 26(e)(1)").

Plaintiff characterizes defendant's argument that he was prejudiced by the passage of the discovery cut-off date as "nonsense." Plaintiff fails to recognize, however, that is not defendant's burden to show prejudice. Rather, the burden of showing harmlessness or substantial justification rests squarely on plaintiff. See *Yeti by Molly, supra,* 259 F.3d at 1107; see also *Hirpa v. IHC Hospitals, Inc.,* 149 F.Supp.2d 1289, 1295 (D.Utah 2001) ("The burden of establishing substantial justification and harmlessness is upon the party who is claimed to have failed to make the required disclosure"). Plaintiff makes no showing in this regard. Although he asserts that defendant's obstructionist discovery tactics delayed his ability to identify the witnesses he would call, he offers no explanation as to how the discovery disputes that transpired in this case prevented him from identifying and disclosing Larrubia, Riccardi and Molina as witnesses in his Rule 26(a) disclosures. he also makes no showing that his failure to disclose Larrubia and Riccardi is harmless. As respects Molina, plaintiff asserts that she is a client of defense counsel. Plaintiff suggests that the existence of this relationship will facilitate defendant's ability to interview Molina concerning her anticipated testimony in the case. The term "harmless" is included in Rule 37 to cover situations such as "the inadvertent omission from a Rule 26(a)(1)(A) disclosure of the name of a potential witness known to all parties; the failure to list as a trial witness a person so listed by another party; or the lack of knowledge of a *pro se* litigant of the requirement to make disclosures." FED. R.CIV.PROC. 37(c), Advisory Committee Notes, 1993 Amendment. Plaintiff's failure to disclose Molina as a person with knowledge of relevant facts does not fall within the ambit of Rule 37 described by the Advisory Committee. Here, the harm to defendant in plaintiff's failure to disclose Molina as a potential witness is not that he does not now have access to her, but that he did not know plaintiff viewed Molina as a potential witness in the case. At this late stage in the proceedings, he does not have the opportunity to propound discovery to plaintiff to determine his view of Molina's relevance or what he may seek to elicit from her as a witness. See *D.L. v. Unified School District # 497,* 270 F.Supp.2d 1217, 1241 (D.Kan.2002) (granting a defendant's motion to strike eleven of its current and former employees and two news

reporters from plaintiff's witness list because "[p]laintiffs' assertion that defendants had knowledge of the existence of the witnesses is simply insufficient to put defendants on notice that these individuals would be potential witnesses in the case").[60]

Accordingly, defendant's motion to exclude the testimony of Larrubia, Riccardi and Molina is granted, except to the extent such witnesses are called solely for impeachment.[61]

### L. Defendant's Motion *in Limine* No. 12 to Preclude Plaintiff from Calling Witnesses for the Sole Purpose of Referring to Purported Discovery Violations

Lastly, defendant moves to preclude plaintiff from calling witnesses for the sole purpose of referring to his purported discovery violations. Although styled as a motion to preclude witnesses, defendant's motion is essentially identical to motion *in limine* No. 6, which seeks to exclude evidence of purported discovery violations. The only difference is that motion *in limine* No. 12 focuses on testimonial evidence of discovery violations. For the reasons set forth in Section F above, the court grants the motion.

### M. Plaintiff's Motion *in Limine* to Exclude Evidence of Convictions and Other Wrongs [62]

Plaintiff moves *in limine* to exclude evidence of his criminal convictions, arrests, and parole violations, including any use of the convictions for impeachment purposes. Defendant argues that evidence of prior incarcerations is relevant in assessing the amount

of emotional damage plaintiff suffered as a result of his over-detention in this case. Defendant also seeks to introduce evidence of plaintiff's prior arrests and incarcerations to demonstrate bias, and for purposes of impeachment.

#### 1. Whether The Evidence Is Admissible Under Rule 404(b)

Rule 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident...." If "other acts" evidence is offered for a permissible purpose, Rule 404(b) requires that the trial judge balance the probative value of the evidence against its prejudicial effect. As the Advisory Committee Notes to Rule 404 state: "The determination must be made whether the danger of undue prejudice outweighs the probative value of the evidence in view of the availability of other means of proof and other facts appropriate for making decision[s] of this kind under Rule 403." FED.R.EVID. 404, Advisory Committee Notes.

#### a. Emotional Distress

Defendant argues that plaintiff's prior convictions and incarcerations are relevant to the extent plaintiff seeks to recover damages for emotional distress, citing *Bryan v. Jones*, 519 F.2d 44 (5th Cir.1975), *Ford v. Wells*, 347 F.Supp. 1026 (E.D.Tenn.1972), and *Alamo Downs v. Briggs*, 106 S.W.2d 733 (Tex.Civ.

---

**60.** This decision was later amended and modified on reconsideration on other grounds. See *D.L. v. Unified School District # 497*, 2002 WL 31296445 (D.Kan. Oct.1, 2002) and *D.L. v. Unified School District # 497*, 2002 WL 31253740 (D.Kan. Oct.4, 2002). It was affirmed in part and vacated in part on other grounds in *D.L. v. Unified School District No. 497*, 392 F.3d 1223 (10th Cir.2004).

**61.** Defendant also seeks to exclude statements contained in the two newspaper articles that are discussed in Section D above. The court has already held that articles constitute inadmissible hearsay. Defendant apparently wishes to have the court to find that none of the statements in

the reports satisfy the residual hearsay exception of Rule 807. As noted, because plaintiff does not indicate which statements in the articles he seeks to admit, the court cannot address whether they satisfy Rule 807's requirement that they be offered as evidence of a material fact, and that their admission will serve the general purposes of the Federal Rules of Evidence and the interests of justice.

**62.** Defendant moves to strike plaintiff's motion for failure to comply with Local Rule 7–3. Although the court elects to hear plaintiff's motion, the parties are advised of the need for full and complete compliance with all procedural rules.

App.1937). In *Bryan*, the Fifth Circuit held in a section 1983 action for false imprisonment that a plaintiff's prior incarceration was relevant to the extent he claimed damages for mental suffering occasioned by wrongful confinement. *Bryan, supra,* 519 F.2d at 46. *Ford* and *Alamo Downs* similarly suggest that a person who has previously been incarcerated may suffer less damage as a result of a subsequent wrongful incarceration. See *Ford, supra,* 347 F.Supp. at 1030 ("Mr. Ford appears to have been arrested for public drunkenness and related crimes some 21 times before this episode; he was not as damaged by being unlawfully arrested and imprisoned as another person with an unblemished record might have been"); *Alamo Downs, supra,* 106 S.W.2d at 738 ("The appellee, having alleged that by reason of the assault and battery and false arrest and imprisonment he suffered great mental anguish, pain, and humiliation, and having testified to such, if he had been in jail for breaches of the peace, we think the fact would be pertinent to go before the jury for their consideration as to the amount of damages allowed in this action").

■ The cases cited by defendant are consistent with Rule 404(a), which allows the use of character evidence for purposes other than proving acts in conformity therewith. None of the cases cited by defendant, however, addresses the issue of prejudice, which Rule 404 requires. See FED.R.EVID. 404(a), Advisory Committee Notes. Although defendant has submitted an offer of proof regarding plaintiff's criminal history, he has not identified which convictions and incarcerations he intends to offer into evidence. Having reviewed plaintiff's criminal history, the court agrees that the fact that plaintiff has been incarcerated on a number of prior occasions, and the length of those periods of incarceration, is relevant to the jury's consideration of the damages he is entitled to recover in this case. See *Peraza v. Delameter,* 722 F.2d 1455, 1457 (9th Cir.1984) (holding that in a § 1983 action for excessive force, the trial court did not abuse its discretion when it admitted evidence of plaintiff's subsequent encounters with the police and difficulties in school as relevant to plaintiff's claim that he suffered injury to " 'head, body

and psyche' " as a result of the arrest); see also *Knudsen v. Welsh,* 872 F.2d 428, 1989 WL 30470, *1 (9th Cir.1989) (Upub.Disp.) (holding that in a § 1983 action for illegal detention, trial court did not abuse it discretion in admitting evidence of defendant's prior arrests, police contacts and periods of incarceration, with a limiting instruction that such evidence was only relevant insofar as it beared on the issue of damages for emotional distress). The nature of the convictions that led to the earlier incarcerations, however, is not relevant to damages, however, and would have a prejudicial impact that would outweigh any probative value that exists. Accordingly, as respects the issue of damages for emotional distress, defendant may introduce evidence of the number and duration of plaintiff's prior periods of incarceration. Plaintiff's contention that such evidence will be unduly prejudicial can be properly addressed by giving an appropriate limiting instruction to the jury.

Defendant may not introduce evidence of the nature of the convictions that gave rise to the incarcerations, however. Further, defendant may not introduce evidence of the fact that plaintiff is currently incarcerated, or of any periods of incarceration that took place after the alleged over-detention.

### b. Bias

■ Defendant also argues that plaintiff's prior arrests and incarcerations by the Los Angeles Sheriff's Department are relevant to show bias against him, citing *Heath v. Cast,* 813 F.2d 254, 259 (9th Cir.1987), *Pittsley v. Warish,* 927 F.2d 3, 5 (1st Cir.1991), and *Eigeman v. City of Great Falls,* 723 F.Supp. 522, 526, n. 5 (D.Mont.1989). A review of plaintiff's criminal record does not reveal any incident in which plaintiff was arrested by the Los Angeles Sheriff's Department. Although he was booked into the custody of the Sheriff's Department on a number of occasions, the mere fact that Sheriff's Department personnel staffed jail facilities where plaintiff was incarcerated is not adequate to show bias. Compare *Heath, supra,* 813 F.2d at 259 (holding that evidence of plaintiff's prior arrest by Newport Beach Police Department and his brother's convictions as a

result of arrests by that same agency were admissible to show bias). Rather, there would have to be some evidence that Sheriff's Department employees took affirmative action against plaintiff. Further, any probative value that such evidence might have is substantially outweighed by the danger of undue prejudice that would result from its admission.

### c. Impeachment

Defendant also seeks to offer evidence of plaintiff's prior convictions for impeachment purposes. Rule 609 of the Federal Rules of Evidence provides:

"For the purpose of attacking the credibility of a witness, ¶ (1) evidence that a witness other than an accused has been convicted of a crime shall be admitted, subject to Rule 403, if the crime was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, and evidence that an accused has been convicted of such a crime shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused; and ¶ (2) evidence that any witness has been convicted of a crime shall be admitted if it involved dishonesty or false statement, regardless of the punishment." FED.R.EVID. 609(a).

It does not appear that any of plaintiff's prior convictions involved dishonesty or a false statement, which would mandate their admission. Defendant also does not indicate which specific felonies he seeks to introduce for purposes of impeachment. Based on the court's review of plaintiff's criminal record, however, the court is doubtful that it would find that the probative value of admitting such evidence outweighed its prejudicial effect. Nevertheless, if defendant intends to offer such evidence, he is directed to make an offer of proof outside the presence of the jury regarding the convictions he seeks to introduce, so that the court may properly balance the probative value of the evidence against its prejudicial effect.

In sum, as respects the issue of emotional distress damages, defendant may introduce evidence of the number and duration of plaintiff's prior periods of incarcerations. Defendant may not introduce evidence of the nature of, or reasons for, those incarcerations. With this exception, plaintiff's motion to exclude evidence of plaintiff's convictions and other wrongs is granted.

### M. Plaintiff's Motion in Limine to Exclude Defendant's Exhibits 100, 102, 103 and 104

#### 1. Exhibits 100 and 102

Plaintiff moves to exclude defendant's Exhibits 100 and 102. Exhibit 100 is a Booking and Property Record, and Exhibit 102 is plaintiff's California Department of Corrections record. As these exhibits include evidence of plaintiff's prior convictions and the facts underlying his parole revocation, plaintiff argues that they should not be unconditionally admitted. Defendant counters that the evidence is admissible to the extent plaintiff seeks to recover for emotional distress, to show bias, and for purposes of impeachment.

As stated above, defendant may introduce evidence of the number and duration of plaintiff's prior periods of incarceration solely to rebut plaintiff's claim that he suffered emotional distress as a result of his overdetention. Defendant may not introduce other evidence of plaintiff's criminal history. Accordingly, if defendant intends to introduce Exhibits 100 and 102, he is directed to offer a redacted version of the document for the court's review outside the presence of the jury, so that the court can ensure the exhibits do not contain improper references to plaintiff's criminal history.

#### 2. Exhibits 103 and 104

Plaintiff also moves to exclude defendant's exhibits 103 and 104. Exhibit 103 is comprised of three sections of the Los Angeles County Sheriff's Inmate Reception Center Unit Manual: § 5–03005.00, "Disputed Warrant Verification"; § 5–12/000.00, "Booking Rear Deputy Duties"; and § 512/002.00, "Disputed Warrant Investigation." Exhibit 104 is a separate section of the manual: § 5–12/010.00, "Inmate Complaints." Plaintiff contends that these exhibits should be excluded because they were not

produced prior to the discovery cut-off date. Defendant counters that he was not aware of the relevancy of such documents until plaintiff filed his opposition to defendant's motion for summary judgment, in which plaintiff first raised the theory that he had complained to LASD personnel and filed a grievance during the period of his alleged over-detention. Defendant contends that he disclosed the documents to plaintiff as supplemental Rule 26 disclosures on August 16, 2004.[63]

Rule 26(a)of the Federal Rules of Civil Procedure provides that "a party must, without awaiting a discovery request, provide to other parties: a copy of, or a description by category and location of, all document, data compilations, and tangible things that are in the possession, custody, or control of the party and that the disclosing party may use to supports its claims or defenses, unless solely for impeachment." FED.R.CIV.PROC. 26(a)(1)(B). Rule 26(e) provides that litigants have a continuing duty to supplement their disclosures under Rule 26(a). Here, because plaintiff first raised the issue of his complaints to LASD personnel, and the filing of a grievance, in opposition to defendant's motion for summary judgment, defendant's failure to disclose Exhibits 103 and 104 prior to the discovery cut-off date was substantially justified. Defendant, moreover, supplemented his Rule 26(a) disclosures in August of last year, so that plaintiff has had ample notice of defendant's intent to rely on the documents. As respects plaintiff's argument that Exhibit 103 is irrelevant because it concerns disputed warrant complaints, as the court is unaware of the specific purpose for which defendant seeks to introduce the exhibit, it cannot make a determination as to relevancy at this time. With this limitation, plaintiff's motion to exclude defendant's Exhibits 103 and 104 is denied.[64]

---

**63.** Declaration of Michael Allen In Opposition To Plaintiff's Motion In Limine To Exclude Defendant's Exhibits 100, 102, 103 and 104, ¶ 4.

---

**64.** Given the court's ruling, the court need not address defendant's argument that plaintiff's motion was untimely.